HOWARD B. QUINN AND CHARLOTTE J. QUINN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4390–68. Filed May 15, 1974.

*Lawrence A. Chez* and *Samuel E. Hirsch*, for the petitioners.
*Nelson E. Shafer*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioners' income taxes as follows:

| Year | Amount |
|---|---|
| 1961 | $1,488,314.34 |
| 1962 | 67,795.04 |
| 1963 | 389,294.97 |
| Total | 1,945,404.35 |

The parties have settled numerous issues raised by the assignment-of-error paragraphs of the petition and amendment to petition. The only issues remaining for decision are as follows:

(1) Whether petitioner Howard B. Quinn's signing of a promissory note in 1963 for the repayment of $500,000 withdrawn without authority during that year from a savings and loan association converted the withdrawal into a nontaxable receipt;

(2) Whether petitioner Charlotte J. Quinn, under section 6013(e),[1] is relieved of liability for income tax on the $500,000 withdrawn by petitioner Howard B. Quinn from the savings and loan association; and

(3) If section 6013(e) does not relieve petitioner Charlotte J. Quinn of income tax on the $500,000, whether the section denies her the guarantees of the 5th and 14th amendments to the United States Constitution.

#### FINDINGS OF FACT

Petitioners Howard B. and Charlotte J. Quinn, husband and wife, were legal residents of Chicago, Ill., at the time the petition was filed. They filed their joint Federal income tax return for 1963 with the district director of internal revenue, Chicago, Ill., employing the cash receipts and disbursements method of accounting.

At all times material to this proceeding through October 25, 1963, Howard B. Quinn (hereinafter Quinn) and Charlotte J. Quinn (sometimes hereinafter Mrs. Quinn) were the owners of not less than two-thirds of the permanent reserve shares of Beverly Savings & Loan Association (hereinafter Beverly), a corporation organized and operating under the Illinois Savings and Loan Act (Ill. Ann. Stat. ch. 32, secs. 701 through 944 (Smith-Hurd 1970)). Both Quinn and his wife were members of the board of directors, and they were chairman of the board of directors and senior vice president, respectively.

During June of 1962, Beverly took possession of and used as its place of business the first three floors and basement of a then recently

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.

constructed seven-story building and parking lot situated at 8001 South Western Avenue in Chicago under a lease dated February 6, 1962, with LaSalle National Bank (LaSalle Bank) as trustee. The building was the only asset of the trust, and Quinn was the trust's sole beneficiary.

The minutes of a special meeting of the Beverly board of directors, held on March 28, 1963, included the following: "Mr. Howard B. Quinn, Chairman of the Board, discussed the possibility of advanced payment of rent by the Association in order to realize a five (5%) percent discount." No resolution on the subject was adopted at that meeting. Mrs. Quinn signed the call and waiver of notice of the meeting, attended the meeting, and, according to the minutes, made or seconded motions on several matters.

On April 3, 1963, a check requisition for Beverly check No. 2174 in the amount of $553,166.66 payable to Quinn Management Co. was prepared for the "Prepayment of Rent Expense. See Board of Directors Approval of 3/28/63." Check No. 2174 was issued in the amount of $553,166.66 and made payable to Quinn Management Co.[2] The voucher copy of the check reflects the following:

Prepayment of rental expense. See board of director's approval of 3/28/63

| | |
|---|---:|
| Prepayment of 4 years' rent ($150,000 per annum) | $600,000.00 |
| Less: 6% discount of | 36,000.00 |
| | 564,000.00 |
| Less: Payment on 4/1/63 | 10,833.34 |
| This payment | 553,166.66 |

Beverly check No. 2174 was deposited to the Quinn Management checking account at Pullman Trust & Savings Bank in Chicago. The check was posted to the account on April 3, 1963. Both Quinn and his wife were authorized to sign checks on this account. On or about March 30, 1963, Mrs. Quinn had signed a check on the account in the amount of $236,585 payable to Beverly to cover the purchase of Beverly shares for Quinn and petitioners' children. Without the $553,-166.66 deposit of the Beverly check, this account would not have had sufficient funds to cover the check for those shares.

A special meeting of the Beverly board of directors was held on April 5, 1963. Mrs. Quinn signed a waiver of the notice of the meeting which indicates that the purpose of the meeting was to consider "the repayment to the Association of rental monies advanced to Quinn

---

[2] The record indicates that Quinn Management Co. was petitioner Howard B. Quinn's *alter ego,* and the briefs have so treated it.

Management Company." The minutes of this meeting contain the following:

Mr. Quinn, Chairman of the Board, acted as Chairman of the meeting, and Mr. Culbertson recorded the minutes. The meeting was called primarily to reconsider the advisability of the Association advancing rent to Quinn Management Company in the sum of $564,000.00 at 6% discount on four years base rent at $150,000.00 per year. This action had been originally discussed in the March 28, 1963 Board of Directors meeting. The matter was thoroughly discussed and it was the consensus of the meeting that this action was not advisable and not in the best interests of the Association, notwithstanding the 6% discount allowed. It was, thereupon, volunteered by Mr. Quinn that the Association would be reimbursed the $564,000.00. Thereupon, on motion duly made and seconded, the following resolution was unanimously adopted:

RESOLVED: That Quinn Management Co. or Howard Quinn repay to the Association the $564,000.00 advanced as rentals as aforesaid on or before April 22, 1963.

On or about April 23, 1963, Quinn restored $53,166.66 to Beverly. No other amount was restored during 1963.

The question of Quinn's repayment of the $500,000 was discussed at the Beverly board of directors annual meeting on April 23, 1963, special meeting of May 28, 1963, and regular meeting of June 20, 1963, which was recessed to July 5, 1963, and then to July 18, 1963 (which was a joint recessed regular June 1963 meeting and the regular July 1963 meeting). Mrs. Quinn attended and participated in all these meetings. At each of these meetings, Quinn was urged to restore the money. At none of the meetings did the board agree to treat the transaction as a loan. At the meeting of July 18, 1963, the board of directors received a report from a law firm which recommended (1) that Beverly request and obtain from Quinn a note in the amount of $500,000, and (2) that Quinn pledge his permanent reserve shares in Beverly, subject to an existing lien held by American National Bank & Trust Co. of Chicago (hereinafter bank). This recommendation, in substance, was adopted, and on July 18, 1963, Quinn executed his note to Beverly for $500,000 secured by his Beverly shares.[3]

The minutes of a regular meeting of Beverly's board of directors, held on August 15, 1963, reflect that the following transpired:

Allan Douglass moved that the Association make demand on Howard Quinn for the payment of his entire indebtedness to the Association by 5:00 P.M., August 21, 1963 and that if such payment is not made, the Association proceed to notify the bonding company on the fidelity bond and proceed to sell or otherwise dispose of all collateral held by the Association to secure such debt. Mr. Waxman seconded

---

[3] The board of directors at this meeting also authorized Beverly's purchase of Quinn's note to the bank in the amount of $300,000. Subsequently, the Federal Savings & Loan Insurance Corp., to which Beverly's assets were assigned on liquidation, recovered judgments against four of Beverly's directors for the unauthorized use of Beverly's funds for this purpose (*Federal Savings & Loan Insurance Corp.* v. *Geisen*, 392 F. 2d 900 (C.A. 7, 1968)) and sued the bank for the recovery of the amounts paid to it (*Federal S. & L. Ins. Co.* v. *American Nat. B. & T. Co. of Chicago*, 392 F. 2d 906 (C.A. 7, 1968)).

the motion. Upon a vote being taken, Messrs. Douglass and Waxman voted in favor of the motion and Mr. Steuber and Charlotte Quinn voted against the motion.

Counsel for the Association advised that Charlotte Quinn should be disqualified from voting because she is an interested party. Charlotte Quinn stated that she had not signed the $500,000 note. The Chairman ruled the motion had failed of adoption.

On December 12, 1963, Quinn was indicted in the United States District Court, Northern District of Illinois, Eastern Division. Count I of a four-count indictment was as follows:

The SEPTEMBER 1963 GRAND JURY charges:

That on or about April 3, 1963, at Chicago, in the Northern District of Illinois, Eastern Division,

HOWARD B. QUINN,

defendant herein, being a Director of the Beverly Savings and Loan Association, Chicago, Illinois, a savings and loan association, the accounts of which were then insured by the Federal Savings and Loan Insurance Corporation, with intent to defraud the said Beverly Savings and Loan Association, did unlawfully and willfully misapply and cause to be misapplied monies, funds and credits belonging to and entrusted to the care and custody of said Beverly Savings and Loan Association in the amount of $553,166.66 by fraudulently causing to be disbursed by Beverly Savings and Loan Association and converting same to his own personal use, benefit and advantage a Beverly Savings and Loan Association Check No. 2174, dated April 3, 1963, in the amount of $553,166.66, made payable to the order of Quinn Management Company, which sum of $553,166.66 purportedly represented a four year prepayment of rent by Beverly Savings and Loan Association to Quinn Management Company, and which disbursement defendant HOWARD B. QUINN well knew was made without the knowledge, consent and approval of the Board of Directors of said Beverly Savings and Loan Association; in violation of Section 657, Title 18, United States Code.

Quinn was tried, convicted, and sentenced under the foregoing indictment, but the conviction was reversed and remanded pursuant to an opinion reported as *United States* v. *Quinn*, 365 F. 2d 256 (C.A. 7, 1966). Quinn was subsequently retried, convicted, and sentenced under count I of the foregoing indictment, and the judgment of conviction was affirmed pursuant to an opinion reported as *United States* v. *Quinn*, 398 F. 2d 298 (C.A. 7, 1968), certiorari denied 393 U.S. 983 (1968).

Beverly assigned Quinn's note dated July 18, 1963, to the Federal Savings & Loan Insurance Corp. on December 31, 1963. In a subsequent year, Quinn resisted efforts to collect the note.

Petitioners' 1963 joint Federal income tax return reported gross income in the amount of $830,966.86. That return, which was dated October 15, 1964, and receipt-stamped October 19, 1964, contains the following statement:

During the taxable year the taxpayer, Howard B. Quinn, received the amount of $553,166.66 from the Beverly Savings and Loan Association. Shortly there-

after the amount of $53,166.66 was repaid and a note for the balance of $500,000.00 was given to the Association to evidence said debt. As security for this loan, the taxpayer assigned his interest in a land trust which held title to certain real estate to the Association. In view of these facts the transaction is considered as a loan and, accordingly, is not reported in this return as taxable income.

The notice of deficiency, addressed to both petitioners, includes the following:

It is determined that the amount of $500,000.00 which you received during 1963 in a transaction with the Beverly Savings and Loan Association, involving property located at 80th Street and South Western Avenue, Chicago, Illinois, constitutes taxable income rather than proceeds of a loan. Accordingly, taxable income has been increased in the amount of $500,000.00.

Respondent has conceded other adjustments in the notice of deficiency that would have increased petitioners' 1963 gross income.

In a Stipulation Regarding Settled Issues, filed January 22, 1973, is the following paragraph:

With respect to the assignment of error asserted in subparagraph (F) of paragraph 4. of the petition, petitioner Howard B. Quinn agrees that taxable income should be increased by $500,000.00 for the taxable year 1963. Petitioner Charlotte J. Quinn also agrees that taxable income should be increased by said $500,000.00 provided she is granted relief for 1963 under *Int. Rev. Code of 1954*, § 6013(e). If such relief is denied, petitioner Charlotte J. Quinn will otherwise contend that she is not taxable with respect thereto.

The Stipulation of Facts filed herein contains the following:

Petitioners concede that the net amount of $500,000.00 received in 1963 ($553,-166.66 less $53,166.66) represents taxable income, but petitioner Charlotte J. Quinn contends that she is relieved from any resulting liability by virtue of *Int. Rev. Code of 1954*, § 6013(e).

OPINION

Howard B. Quinn has conceded as part of an overall settlement of his tax liability that he is taxable on the net amount of $500,000 received from Beverly in the transaction of April 3, 1963. Even though Mrs. Quinn filed a joint return with Quinn for 1963, she is nonetheless entitled to have the amount of her liability determined separately. However, we can see no ground on which she can escape joint and several liability for the income tax on the net amount of the April 3, 1963, receipt from Beverly.

First, notwithstanding the stipulation quoted in our Findings, which appears technically to foreclose her argument, Mrs. Quinn contends that the principle of *Wilbur Buff*, 58 T.C. 224 (1972), revd. 496 F. 2d 847 (C.A. 2, 1974), precludes the inclusion of the $500,000 in petitioners' taxable income for 1963. We do not agree.

Quinn received the amount of $553,166.66 from Beverly as prepayment of 4 years' rent on the building. At the demand of the board of

directors, he restored $53,166.66 and promised to repay the balance. But Beverly did not give its "consensual recognition" of the transaction as a loan in the manner found in the *Buff* case.

The minutes of each of the six meetings of the board of directors in April, May, June, and July 1963 show that Quinn was being pressed to restore the money. True, he signed a note for the $500,000 on July 18, 1963, at the suggestion of Beverly's attorney, to give Beverly such protection as the note would provide. But the minutes of the August 15, 1963, meeting of the board of directors show the board continued to insist on the repayment of the funds—that a deadline was set for repayment of the money with the stipulation that failure to restore it would result in a report to Beverly's bonding company and the disposition of available collateral. Indeed, Beverly could not have made a legal loan to Quinn, its principal shareholder. Ill. Ann. Stat. ch. 32, sec. 801 (Smith-Hurd 1970). And before the year 1963 was closed, Quinn had been indicted by a grand jury for misapplying the money.

Mr. and Mrs. Quinn received the $500,000 and used it for their own purposes. We think they realized taxable income under either *James v. United States*, 366 U.S. 213 (1961), as a misappropriation of Beverly's funds, or *North American Oil* v. *Burnet*, 286 U.S. 417 (1932), as the receipt of funds under a claim of right. At no time did Beverly give its consent to treating the transaction as a loan in the manner described in the *Buff* case.

Next, Mrs. Quinn relies upon section 6013(e),[4] the so-called innocent spouse provision, to save her from the tax. To qualify for relief under that section, however, the evidence must show:

1. That there was omitted from gross income an amount properly includable therein which is attributable to Quinn and which is in excess of 25 percent of the amount of gross income stated on the return, sec. 6013(e)(1)(A);

---

[4] SEC. 6013. JOINT RETURNS OF INCOME TAX BY HUSBAND AND WIFE.

(e) SPOUSE RELIEVED OF LIABILITY IN CERTAIN CASES.—

(1) IN GENERAL. Under regulations prescribed by the Secretary or his delegate, if—

(A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return,

(B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and

(C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission,

then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income.

(2) SPECIAL RULES.—For purposes of paragraph (1)—

\*    \*    \*    \*    \*    \*    \*

(B) the amount omitted from gross income shall be determined in the manner provided by section 6501(e)(1)(A).

2. That in signing the return, Mrs. Quinn did not know of, and had no reason to know of, the omission, sec. 6013(e)(1)(B); and

3. That she did not significantly benefit directly, or indirectly, from the items omitted and that it would be inequitable to hold her liable for the deficiency, sec. 6013(e)(1)(C). All three of these requirements must be met, *Patricia E. Mysse*, 57 T.C. 680, 697 (1972), and we do not think they were.

We are not at all satisfied that Mrs. Quinn meets the first requirement, set forth in section 6013(e)(1)(A)—that an amount in excess of 25 percent of the amount of gross income stated on the return was omitted. Section 6013(e)(2)(B) commands that the amount omitted from gross income "shall be determined in the manner provided by section 6501(e)(1)(A)," the 6-year statute of limitations on the assessment of deficiencies. S. Rept. No. 91–1537, 91st Cong., 2d Sess. (1970), 1971–1 C.B. 606. Subparagraph (ii) of section 6501(e)(1)(A) is as follows:

In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary or his delegate of the nature and amount of such item.

The statement contained in the return describing the $500,000 as a loan, quoted in our Findings, is quite obviously sufficient to apprise the Secretary or his delegate of the nature and amount of the disputed item. *Benderoff* v. *United States*, 398 F. 2d 132, 137 (C.A. 8, 1968). Therefore, the $500,000 was not "omitted from gross income" within the meaning of section 6013(e)(1)(A).

Nor does the evidence show that Mrs. Quinn did not know the $500,000 was received by Quinn and omitted from the computation of taxable income on the return within the meaning of section 6013(e)(1)(B). Indeed, the statement attached to the joint return recites that Quinn had received the money from Beverly. The mere fact that Mrs. Quinn misconceived the legal consequences of the receipt of the money at the time the return was filed does not relieve her of the tax. *Robert L. McCoy*, 57 T.C. 732, 734 (1972).

Furthermore, the record is replete with evidence that she was fully aware of the entire transaction in which Quinn received the net amount of $500,000. She was senior vice president of Beverly and a member of its board of directors. She attended the board's meeting of March 28, 1963, where Quinn proposed that Beverly make the advanced payment of rent. Two days later she drew the check for $236,585 on the Quinn Management account at Pullman Trust & Savings Bank to cover the purchase of Beverly shares for Quinn and their children. The check would not have been good without the deposit of Beverly's check for the prepaid rent.

Mrs. Quinn signed the waiver of notice of the meeting of April 5, 1963, which states that the purpose of the meeting was to consider "the repayment to the Association of rental monies advanced to Quinn Management Company." Six other meetings were held in April, May, June, and July of 1963, described in our Findings, at which the matter was discussed, and one or more members of the board insisted that the money be repaid or Quinn was given additional time to repay it. Finally, at a meeting of the board of directors on August 15, 1963, Mrs. Quinn was recorded as having voted against a motion that Beverly notify the bonding company covering Quinn's liability and proceed to liquidate available collateral. That the matter must have been indelibly impressed upon her mind is demonstrated by the fact that an effort was made to disqualify her vote. Indeed, Quinn was indicted before the end of the year, on December 12, 1963, and later prosecuted and convicted for having misapplied Beverly's funds in the April 3, 1963, transaction.

We think it apparent that Mrs. Quinn knew the $500,000 was received by Quinn and was not reported as income on the 1963 return. She does not qualify, therefore, for the relief provisions of section 6013(e). See *Raymond H. Adams*, 60 T.C. 300, 303–304 (1973) ; *Jerome J. Sonnenborn*, 57 T.C. 373, 381–382 (1971) ; *Herbert I. Joss*, 56 T.C. 378, 387–388 (1971).[5]

We find no merit in Mrs. Quinn's argument that, if she does not qualify for the relief afforded by section 6013(e), the section deprives her of the rights to due process of law and equal protection of the laws guaranteed by the 5th and 14th amendments to the Constitution. The filing of a joint return is a privilege granted married persons which they may elect. The privilege ordinarily works to their mutual advantage.

However, some highly inequitable results were called to the attention of Congress, particularly where a wife had been divorced or separated or abandoned after the tax year, where she was saddled with a disproportionately high tax liability as a consequence of having filed a joint return, where such liability grew out of income attributable only to the husband, unknown to the wife, and where she had not enjoyed any benefit therefrom.' * * * [Fn. omitted.]

*Jerome J. Sonnenborn*, 57 T.C. at 381. Section 6013(e) was enacted to provide relief from liability in certain of these cases. S. Rept. No. 91–1537, 91st Cong., 2d Sess. (1970), 1971–1 C.B. 606. We do not think the provisions in section 6013(e)(1)(A) or (B), applicable in the instant case, which turn the right to the relief on the amount of the omission and the spouse's lack of knowledge of the omission of income

---

[5] Having found that the 25-percent-omission requirement was not met and that Mrs. Quinn failed to prove that she did not know of, or have reason to know of, the omission of the $500,000 from the return, we need not consider the third requirement for relief, set forth in sec. 6013(e)(1)(C).

232

at the time the joint return election is voluntarily made,[6] make an unreasonable classification for tax purposes. Cf. *United States* v. *Maryland Savings-Share Ins. Corp.*, 400 U.S. 4, 6 (1970); *Brushaber* v. *Union Pac. R.R.*, 240 U.S. 1, 24–26 (1916); *Vivien Kellems*, 58 T.C. 556, 558 (1972), affirmed per curiam 474 F. 2d 1399 (C.A. 2, 1973), certiorari denied 414 U.S. 831 (1973).

To give effect to the settlement of other issues,

*Decision will be entered under Rule 155.*

---

[6] Mrs. Quinn's constitutional argument is directed to only sec. 6013(e)(1)(B), the lack-of-knowledge requirement, but appears to be equally applicable to sec. 6013(e)(1)(A), the amount-of-omission requirement.