AUDREY BILLER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Biller v. Commissioner
Docket No. 2200-74.
United States Tax Court
T.C. Memo 1976-97; 1976 Tax Ct. Memo LEXIS 305; 35 T.C.M. (CCH) 406; T.C.M. (RIA) 760097; March 29, 1976, Filed Joseph E. Johnson and B. J. Smith, for the petitioner. Dudley W. Taylor, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in the Federal income tax of petitioner and her husband, Morris Biller, and additions to tax under section 6653(b), I.R.C. 1954, [1] for the years and in the amounts as follows: Addition to Tax
Tax Year Ended
Deficiency
Under Sec. 6653(b)
Dec. 31, 1964
$ 111.05
$ 0
Dec. 31, 1967
3,364.58
1,682.29
Dec. 31, 1968
45,844.25
22,922.13
Dec. 31, 1969
111,443.43
55,721.72
Dec. 31, 1970
18,630.24
9,315.12
*306 *307 Petitioner has agreed that the understatement of income as determined by respondent in the statutory notice of deficiency is correct for all of the years here in issue and respondent has agreed that no part of such underpayment for any of the years here in issue is due to fraud by this petitioner. This leaves for our decision only whether petitioner is entitled to be relieved from the portion of the deficiency that results from understatement of income for each of the years 1968, 1969 and 1970 under the provisions of section 6013(e). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Audrey Biller (petitioner) resided in Memphis, Tennessee at the time her petition in this case was filed. Petitioner and her husband, Morris Biller, filed a joint Federal income tax return for the calendar year 1964 with the District Director of Internal Revenue, Nashville, Tennessee. They filed joint Federal income tax returns for the calendar years 1967, 1968, 1969 and 1970 with the Southeast Service Center, Chamblee, Georgia. Next to the signature of Morris Biller on the 1968 return appeared the date July 7, 1969. No date appears next to petitioner's signature. *308 The 1968 return was filed on July 11, 1969. [2] The 1970 return shows next to the signature of Morris Biller the date of October 13, 1971. No date appears on this return next to petitioner's signature. The return for 1970 shows October 8, 1971, as the date it was signed by the preparer and this return was filed on October 15, 1971. The return for 1968 reported under adjusted gross income a loss of $ 1,247.50. The return for 1969 reported under adjusted gross income the amount of $ 28,275.38, of which $ 7,500 was salary received by petitioner and $ 3,909.37 the taxable portion of capital gains, total long-term and short-term capital gains being shown as $ 6,021.25. The 1970 return reported under adjusted gross income a loss of $ 25,374.78. Petitioner married Morris Biller in 1949. They have two daughters, Sharon and Brenda, who were 25 and 20 years old in April 1975, respectively. Sharon entered college at Memphis State University in 1968. Petitioner received a Bachelor's degree with a major in *309 business management from Memphis State College in 1951. While in college she took one year of basic accounting. Petitioner has been employed by Memphis Concrete Silo Company, a corporation owned by petitioner and members of her family, since her graduation from college. Since some time in 1954 she has been secretary-treasurer of the corporation. Petitioner does all the posting of the records of the corporation and prepares the quarterly reports, and in addition signs most of the checks on behalf of the corporation. She keeps all of the normal day-to-day records which she furnishes once each month to a C.P.A. who is retained by the corporation. Petitioner has been engaged in the same type of occupation since she first became employed by her family-owned business. For her services to the corporation petitioner in the years here before the Court received a yearly salary of $ 7,500 to $ 9,500. Generally she would endorse her salary checks and turn them over to her husband who either cashed them or deposited them in the joint checking account maintained by petitioner and her husband. Mr. Biller's formal education ended in the tenth grade in high school. Prior to 1967 he had been employed *310 for approximately 13 years as a salesman for Palmolive-Colgate Company. In 1967 he purchased and began to operate a grocery store in Memphis, Tennessee known as Big Star Food Store No. 9. A loss was incurred on the operation of this store in 1967 and 1968. The returns of petitioner and Mr. Biller for these years reported the losses from the grocery store operation as $ 14,026.41 and $ 14,810.89, respectively. Late in 1967 Mr. Biller began operating a business as a sole proprietorship under the name of Mid-South Marketing Services (Mid-South). The business of Mid-South consisted of acting as a clearing house between retail grocers and manufacturers for discount coupons. Various manufacturers would issue coupons which provided for a stated discount from retail price upon the purchase of various products. These coupons would be distributed to purchasers of products handled by grocery stores for use when purchasing the product at retail. The coupons would be collected by Mr. Biller or employees of Mid-South from the grocery stores which had honored them as part of the purchase price of the article. Mid-South would forward the coupons to the appropriate manufacturer for redemption. Mid-South *311 would receive the payment for redemption from the manufacturer and would send a weekly or monthly check to each retail grocer for the total amount of the coupons which had been collected from that grocer. In this way the grocer would receive checks ranging in amounts from $ 25 to $ 150 or upward for a number of coupons instead of having to redeem small 10( to 25( coupons with various manufacturers. When Mid-South sent the coupons collected from the grocers to the various manufacturers it would receive the face value plus 3 percent of face value. The 3 percent covered a payment which was made by Mid-South to the grocer of 1-1/2 percent of the face value of the coupon for handling expense of the grocer and 1-1/2 percent which was retained by Mid-South as compensation for its services. Mid-South also acquired coupons at large discounts from the face value of the coupons from persons engaged in the illegal sale of such coupons. Some coupons would be placed in trash receptacles or otherwise disposed of unused by the person to whom they had been sent by the manufacturer. These coupons would be collected by someone engaged in the illegal sale of such coupons. Mr. Biller, after purchasing *312 these coupons, would intermingle them with coupons he had obtained from retail grocers and would redeem them under various fictitious names of grocery stores. Generally Mr. Biller would do this intermingling himself in the evening. Although at the height of the operation of Mid-South the business employed up to 30 persons, Mr. Biller had none of the employees intermingle the illegally acquired coupons with the coupons obtained legitimately from grocers. Mid-South maintained a bank account in its name. Both petitioner and Mr. Biller had authority to draw checks on that account. When checks were returned for coupons Mr. Biller would himself remove certain checks which he would cash. He would retain the cash received from these checks in cash. The checks which he personally removed and cashed were his estimate of the amounts covered by the illegally acquired and redeemed coupons. However, it was difficult to keep the payments for the illegally redeemed coupons separate from the amounts of legitimately redeemed coupons, so some of the funds from the illegally redeemed coupons went into Mid-South's bank account. At times Mr. Biller would make a draw on Mid-South's bank account for his *313 personal use and the funds which he drew would be placed in the joint account which he and petitioner maintained. He viewed the draw as being in the nature of a salary. He used some of the cash received from checks he withdrew and cashed without putting them through the bank account of Mid-South to buy additional coupons from illegal sources. At the beginning of Mid-South's operation petitioner assisted her husband with the bookkeeping and prepared checks on Mid-South's account for payment to grocers. She at times signed checks that she prepared on Mid-South's account and would post these checks to the check record and reconcile bank records of Mid-South. Petitioner's authority to sign checks on Mid-South's account continued throughout Mid-South's existence. However, approximately 2 years after commencement of Mid-South's operation a full-time bookkeeper was employed by the business and petitioner ceased to assist with the check writing and posting and reconciling of the bank statements. On April 9, 1969, Mr. Biller purchased a Piper PA-32 aircraft for $ 16,800 and paid this purchase price in currency. The certificate of title for the aircraft was issued in the names of "Morris *314 or Audrey Biller." On April 21, 1969, this aircraft was traded by Mr. Biller on another Piper PA-32 aircraft. This second aircraft had an automatic pilot and other equipment which was not on the Piper PA-32 initially purchased. In addition to the trade-in, Mr. Biller paid $ 3,500 in currency for the second Piper PA-32. On the same day that the second aircraft was purchased application was made to put the certificate of title in the names of "Morris and/or Audrey Biller." On May 16, 1969, Mr. Biller traded in the second Piper PA-32 on a Piper PA-23 aircraft. The Piper PA-23 was a twin-engine plane which cost $ 38,800. In addition to trading in the Piper PA-32 acquired on April 21, 1969, Mr. Biller paid $ 18,500 in currency for the Piper PA-23. The certificate of title to the Piper PA-23 was in the name of "Morris and/or Audrey Biller." Petitioner knew of the purchase of the three aircraft in 1969 and knew the location of the hangar in which the aircraft were maintained. Petitioner did not inquire as to the amounts paid for the three aircraft, whether the payments were in cash, or how much was paid for hangar space, fuel, and other up-keep on the aircraft. Mr. Biller had obtained *315 a pilot's license in either 1958 or 1959 and shortly thereafter he went into partnership on a small plane with another person and paid $ 750 on the plane. He kept his interest in the plane around 6 or 7 months and then purchased a plane either in his own name or in his name jointly with his wife for $ 3,800. He disposed of that plane and a year or more later purchased a Cessna 170 for which he paid $ 4,500. He traded the Cessna 170 on a plane he bought in partnership with a Mr. Walker. The plane he bought with Mr. Walker cost $ 11,000 and he and Mr. Walker each paid 50 percent of the price, Mr. Biller being credited for the amount received on the trade-in of his Cessna 170 and paying the difference between that amount and his one-half of the cost of the new plane. Mr. Biller kept his interest in this plane for about a year and sold his interest to Mr. Walker around 1961 when he and petitioner built a home. Petitioner and her husband took several weekend trips in the Piper PA-23 aircraft in 1969 and 1970 and petitioner accompanied Mr. Biller on one business trip he took in the plane. The Piper PA-23 was sold in 1970 for $ 27,500. Petitioner and her husband both wrote checks on the *316 joint bank account they maintained in the years here in issue, although Mr. Biller wrote more checks on this account than petitioner. When petitioner wrote checks on the joint bank account she was aware of the balances in that account. In 1967 petitioner owned a 1967 Chrysler automobile and throughout the years here in issue petitioner owned the 1967 Chrysler automobile. Mr. Biller also owned a Chrysler automobile during the years here in issue. Petitioner and her husband bought a new automobile for their daughter, Sharon, when she entered college in 1968. The residence owned by petitioner and her husband during the years here in issue was built in 1961. The house was built on a lot which had been given to petitioner by her mother. Petitioner and her husband sold a house they owned and were living in and used the funds received from that sale plus funds received from a mortgage on the new house to pay for the new house. Petitioner and her husband later added a swimming pool to the property. Petitioner had charge accounts at most of the stores in Menphis during the years here in issue. As a result of his transactions involving illegally acquired coupons, Mr. Biller was indicted *317 for mail fraud under Title 18, U.S.C. sec. 1341, prior to March 29, 1971. Petitioner learned of the charges in this indictment with respect to her husband's traffic in illegally acquired coupons at the time it was returned. Trial under the indictment was commenced in June 1970 and part way through the trial Mr. Biller pleaded guilty to nine counts of the indictment and was setenced to nine months in a Federal prison. On March 29, 1971, Mr. Biller transferred to petitioner his interest in the residence which they owned jointly. The transfer was without consideration. On the same day, March 29, 1971, petitioner deeded this residence to Frank Vego, a half-brother of her husband. Mr. Vego gave petitioner $ 10,000 and a note in the face amount of $ 34,000, and in addition assumed the existing mortgage on the residence. The stated sales price of the residence was approximately $ 70,000. Mr. Vego has never made any payments on the $ 34,000 note given to petitioner and petitioner still holds this note. Petitioner has lived continuously in the residence deeded to Mr. Vego from March 29, 1971 through April 1975, the time of the trial of this case. Petitioner turned over *318 to her husband the $ 10,000 given to her by Mr. Vego when she deeded the residence to Mr. Vego to be used to pay for legal fees in the criminal proceedings which had been instituted against her husband. The records maintained on behalf of Mid-South by Mr. Biller consisted primarily of a cash disbursement journal and a general ledger. At the end of the year these records were turned over to an accountant for the preparation of the tax returns of petitioner and Mr. Biller. During the years 1967 and 1968 the records of Big Star Food Store No. 9 were also utilized by the accountant in the preparation of the Federal income tax returns of petitioner and Mr. Biller. These records were generally maintained for the store by Malone and Hyde Retail Services, a food broker. On May 13, 1971, Mr. Biller was notified by a letter from a special agent of the Internal Revenue Service that an offical investigation was commencing of the joint Federal income tax returns filed by him and petitioner for the years 1967, 1968, and 1969. In the notice of deficiency respondent computed the taxable income of petitioner and Mr. Biller for the years here in issue as follows: 1964
1967
1968
1969
1970
Taxable Income
as
Previously
$ 2,619.85 [1]
Adjusted
Adjusted Gross
Income
As Reported
$ 16,130.63
$ 3,118.74
$ 28,275.38
($ 25,374.78)
Taxable Income
As
Reported
8,412.27
20,942.77
Adjustments
(See
Attached List)
16,046.73
115,277.42
189,449.16
76,556.31
Taxable Income
As
Revised
8,412.27
19,165.47
117,897.27
210,391.93
51,181.53
Total Tax
1,576.88
4,081.78
44,720.68
116,212.90
18,092.04
Investment
1,139.60
120.59
75,069.00
Credit
*319 The attached list referred to in this computation disclosed the following: 1967
1968
1969
1970
(a) Additional Income
$ 23,972.33
(b)%additional Income
$ 95,519.45
$ 204,649.47
$ 63,565.93
(c) Schedule C Expenses
14,492.14
(124.06)
(d) Contributions
(410.00)
(e) Interest Expense
(3,614.73)
(f) Miscellaneous Expenses
(10.00)
(g) Medical Expense
(497.87)
386.88
1,063.88
(h) Taxes
(993.00)
(i) Personal Exemptions
(2,400.00)
(2,500.00)
(j) Coupon Purchases
13,948.88
15,571.70
2,289.10
(k) Loss on Operation of
Grocery Store
(8,708.40)
(l) Sales Taxes
(361.53)
(287.60)
(m) Postage Expense
(1,132.50)
(n) Depreciation Expense
(240.83)
(578.01)
(o) Change of Accounting
Method
(30,424.33)
30,424.33
(p) Payroll Taxes
780.28
(658.08)
(q) Long Term Capital Gain
469.09
(r) Loss on Worthless Note
(1,000.00)
(s) Legal Expense
(12,500.00)
(t) Itemized Deductions
(3,362.90)
The explanation of item (a) for 1967 was that "[in] the absence of adequate records, your adjusted *320 gross income has been computed upon the basis of increase in net worth during the taxable year 1967, with adjustment for nontaxable items of income, if any, and for personal and other non-deductible amounts. Accordingly, your taxable income is increased in the amount of $ 23,972.33." Item (b) for the years 1968, 1969 and 1970 was explained as follows: "It is determined that you received additional income in the amount of $ 95,519.45, $ 204,649.47 and $ 63,565.93 for the taxable years ended December 31, 1968, December 31, 1969 and December 31, 1970, respectively, * * *." OPINION Section 6013 (e) [3] entitled "Spouse Relieved of Liability in Certain Cases" provides that if a joint return has been made for a taxable year and on such return there was omitted from gross income an amount properly includable which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, the other spouse may where specified conditions are established be relieved from liability for the tax attributable to the omission of such income. One of the facts which must be established is that the spouse seeking to be relieved of the tax did not know *321 of and had no reason to know of such omission at the time of signing the return. Another requirement is that the spouse seeking relief establish that, taking into account whether she significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold her liable for the deficiency attributable to such omission. Petitioner in the instant case claims that she should be relieved of liability under the provisions of this section for the years 1968, 1969 and 1970. *322 Initially, it might be pointed out that even if petitioner were able to establish that she came within the provisions of section 6013 (e), she would not be relieved from all of the deficiencies in tax for the years here in issue. From the facts we have set forth, it is clear that certain of the adjustments which gave rise to additional tax in each of these years were not the result of omissions from gross income. To the extent of the other adjustments petitioner is liable for the resulting deficiencies because of having joined in a joint return with her husband. Jennie Allen,61 T.C. 125, 131-132 (1973), affirmed on this issue, reversed and remanded on another issue, 514 F. 2d 908 (5th Cir. 1975). The record here is clear and respondent agrees with petitioner that there has been an omission from gross income on the joint returns filed by petitioner and her husband in each of the years 1968, 1969 and 1970 in an amount in excess of 25 percent of the amount of gross income stated on the return and that the omission is attributable to petitioner's husband and not to petitioner. The record shows that the omissions resulted principally from failure to include *323 in income the amounts received by petitioner's husband from proceeds of checks of Mid-South's which he cashed and did not deposit in the bank account of Mid-South. The checks totaled approximately the amounts of payments for redemption of coupons illegally acquired by Mr. Biller. Our issue, therefore, is limited to whether the other requirements of section 6013(e) are met. In order to qualify for the relief from tax liability provided for under section 6013 (e) (1) petitioner must establish that all the conditions for such relief set forth in that section are met. Raymond H. Adams,60 T.C. 300 (1973). In our view the record is clear that petitioner either knew, or had reason to know, of the omission of income for the year 1970 at the time of signing the return for that year. Although no date appears next to petitioner's signature on the 1970 return, the return shows a date of October 8, 1971, next to the signature of the preparer. This return was obviously signed by petitioner on or after that date and a reasonable inference is that the October 13, 1971 date appearing next to the signature of petitioner's husband is also the date the return was signed by petitioner. *324 Prior to March 29, 1971 petitioner's husband had been indicted for mail fraud in connection with his illegal activities in redeeming coupons and in June of 1971 had been convicted under this indictment. Petitioner testified that she did not find out about her husband's illegal activities until his indictment. If we accept this testimony as being equivalent to a statement that she had no reason to know of his receipt of more income from the coupon business than was reported on the tax returns, which we do not, it does not explain why after the indictment and conviction of her husband she was not on notice of the activities in which he had engaged and that these activities resulted in receipts of income which was not included in the books and records of Mid-South and was therefore omitted from income reported on the 1970 return. Petitioner is an educated and intelligent woman with business experience. With the knowledge she acquired after her husband's indictment and conviction, she certainly reasonably should have known of omissions from income in 1970 of the amounts resulting from his illegal activities. She had up to some time in 1969 assisted with the Mid-South bookkeeping and therefore *325 knew how receipts were included in those books and records. She understood bookkeeping. The facts with respect to the years 1968 and 1969 are not as unmistakably clear as are the facts with respect to the year 1970. We note from the record that while petitioner testified of lack of knowledge of her husband's business activities and her lack of knowledge of his illegal activities until the time of the indictment, she at no juncture specifically stated that she did not know of the omission from gross income on the returns for 1968 and 1969. Petitioner asks us from her testimony as to her lack of knowledge of her husband's business to draw an inference that she did not know of these omissions and had no reason to know of them. In our view the inference which petitioner asks us to draw from her testimony as to her lack of knowledge of her husband's business affairs is not warranted by this record. She had assisted with record keeping for Mid-South in 1968 and part of 1969. She gave no explanation of why she made no inquiry as to the costs of operating the business as compared to the receipts from the operation while she was doing bookkeeping for the business. It appears from this record *326 that she may have studiously avoided checking into the omissions of income from the Mid-South business. See Sanders v. United States,509 F. 2d 162, 169 (5th Cir. 1975). On the basis of the record as a whole we conclude that petitioner reasonably should have known of these omissions from income at the time she signed the 1968 and 1969 returns. Apparently petitioner signed the 1968 return in early July 1969. In April and May 1969 her husband had paid $ 38,800 in cash for the aircraft he bought. Petitioner testified that she did not inquire of him about these expenditures. In our view we are not warranted from her lack of inquiry about these expenditures to infer that she was not reasonably aware of the cost of the type of aircraft which her husband acquired and the cost of maintaining such an aircraft. Petitioner took several trips with her husband in the most costly of these aircraft. Her husband had previously owned interests in much less costly aircraft. In our view even though petitioner did not inquire from her husband as to the cost of the aircraft she reasonably must have been aware in a general way of the cost of the type of aircraft acquired by her husband *327 and the cost of maintaining such aircraft. When this type of cost is compared with her salary and the small income or losses reported by petitioner and her husband on their 1967 and 1968 tax returns, in our view the inference is that pettrioner reasonably should have known that income was being omitted from the joint income tax return. Particularly is this true in light of the fact that petitioner and her husband maintained a home on which they were making mortgage payments, supported two teenage daughters, and each drove a Chrysler automobile. In 1968 they purchased an automobile for one daughter they were sending to college. Had petitioner been a woman of limited education and without business experience it would be difficult to believe that she should not have known of the omission of income from the joint tax return. However, she not only was an educated person with business experience but even was knowledgeable in the areas of business management and accounting. On this record petitioner has totally failed to meet her burden of showing that she, at the time of the signing of the returns for the years 1968 and 1969, had no reason to know of the omissions from gross income and therefore *328 she does not qualify for relief under section 6013(e). Howard B. Quinn,62 T.C. 223, 231 (1974). Respondent also argues that petitioner has failed to establish that she did not significantly benefit directly or indirectly from the omitted income. Petitioner points out that the payment of ordinary living expenses is not to be considered as a significant benefit from the omitted income. Petitioner relies on Dakil v. United States,496 F. 2d 431 (10th Cir. 1974), in which the Court held that three automobiles of indeterminate value, a country club membership, vacation trips, and private schools for children were not necessarily to be considered a benefit from a lavish life-style for a doctor's wife. In that case the spouse who had omitted the income was dead and the record showed that his widow had nothing from his accumulation but was living on a small Social Security monthly payment and earnings received as a part-time outreach worker with senior citizens. The circumstances in the instant case are substantially different from those in Dakil v. United States,supra.Here, after his indictment, petitioner's husband transferred *329 full ownership of their residence to petitioner. The reason for this transfer is never satisfactorily explained in the record. Petitioner stated that her husband's half-brother was considering coming to Nashville to live and needed a house. Even if this were a fact, there is no explanation of why her husband's interest in the house needed to be transferred to her for the house to be sold to his half-brother. There is no satisfactory evidence in this record to show that the transfer of the house to petitioner was not a means of letting her retain assets which might otherwise be subject to repayment of some of her husband's illegally procured receipts which were omitted from reported income. Mr. Biller's half-brother has never moved into the house nor paid any amount on the mortgage given to petitioner. Apparently either he has been paying the mortgage which petitioner and her husband had on the house, which he supposedly assumed with so-called rent paid by petitioner for the house, or petitioner has been making these payments. The record on this point is not clear. Petitioner and her husband were still married at the time of the trial of this case. Other than petitioner's statement *330 that she just bought the things she and the daughters needed with money given her by her husband and that she did not live extravagantly, this record is devoid of evidence that petitioner has not significantly benefited from the omitted income. process which is vested exclusively in the discretion of a The record does not show what use was made of the omitted funds other than Mr. Billers' testimony that some of these funds were used to purchase more illegal coupons. From this record we might assume some of these funds were used to buy aircraft. As far as this record shows some of the omitted funds may have been used for petitioner's benefit in years after the years here in issue. The burden is on petitioner to show that she did not significantly benefit from the omitted funds. Jerome J. Sonnenborn,57 T.C. 373, 383 (1971). However, since we have held that in our view petitioner reasonably should have known of the omitted income at the times she signed the returns, we need not decide the issue of whether petitioner received either directly or indirectly any significant benefit from the omitted income. Decision will be entered for the respondent.
Footnotes
1. All references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated. The petition also places in issue the years 1964 and 1967. However, on brief petitioner argues only that she should be relieved from a portion of the deficiency for 1968, 1969 and 1970. The deficiency notice shows that respondent made no change in the reported income of petitioner and her husband in the year 1964 but merely disallowed an investment credit. Therefore, obviously section 6013(e) would have no application to this year. For the year 1967 respondent determined the tax of petitioner and her husband on the basis of increase in net worth. Since in this year petitioner's husband was conducting a grocery business from which he reported gross receipts in excess of approximately $ 553,000 but sufficient costs and deductions to result in a reported loss from this grocery business of approximately $ 14,000, it is obvious, as petitioner apparently recognizes, that the record affords no basis of determining whether the deficiency for 1967 resulted from understatement of income or overstatement of expenses. See H.A. Hurley,22 T.C. 1256, 1264-1265 (1954), affd. 233 F.2d 177↩ (6th Cir. 1956).
2. The date next to the signature of the preparer of the 1968 return is not completely legible. The date of "27" and the year of "69" can be read, but the month is totally illegible.↩
1. The return as filed for 1968 shows adjusted gross income as a loss of $ 1,247.50.↩
3. SEC. 6013. JOINT RETURNS OF INCOME TAX BY HUSBAND AND WIFE. * * *
(e) Spouse Relieved of Liability in Certain Cases.-- (1) In general. Under regulations prescribed by the Secretary or his delegate, if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income. (2) Special rules. -- For purposes of paragraph (1)-- (A) the determination of the spouse to whom items of gross income (other than gross income from property) are attributable shall be made without regard to community property laws, and (B) the amount omitted from gross income shall be determined in the manner provided by section 6501(e)(1)(A).↩