WAYNE JOHNSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Johnson v. Commissioner
Docket No. 6404-77.
United States Tax Court
T.C. Memo 1980-569; 1980 Tax Ct. Memo LEXIS 17; 41 T.C.M. (CCH) 602; T.C.M. (RIA) 80569; December 22, 1980
*17 Held, petitioner is entitled to relief from tax liability as an innocent spouse under section 6013(e), I.R.C. 1954. Richard W. Swanson, for the petitioner. Matthew W. Stanley, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies and additions to tax in petitioner's Federal income taxes: Section 6653(a) [1]
Year
Deficiency
Addition to Tax
1973
$ 2,034.00
$ 101.70
1974
5,798.00
289.90
1975
2,266.00
113.30
Petitioner does not dispute the amount of the deficiencies. The sole issue for decision is whether petitioner is relieved of tax liability as an innocent spouse under section 6013(e). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Wayne Johnson (hereinafter petitioner) resided in Everett, Washington, when he filed his petition in this case. Petitioner and his former wife, Sandra Larson (hereinafter Sandra), filed joint Federal income tax returns for the years 1973, 1974, and 1975 with the Ogden Service Center, Ogden, Utah. Petitioner graduated from high school in 1967 and served for four years in the navy. He spent *19 his entire naval tour in Vietnam and received an honorable discharge in 1971. In September 1972, petitioner and Sandra were married. Sandra had three children from a previous marriage who in 1972 were 12, 11 and 7 years of age. The children resided with petitioner and Sandra throughout the years at issue. In January 1973, petitioner enrolled in Everett Community College in part to take advantage of the Veterans Administration benefits accruing to him. He attended that college on a part-time basis until 1976 when he received an Associate Technical Arts degree and a degree in welding. While attending college in 1973 and 1974, petitioner was also semi-regularly employed in the evenings as a laborer for the Scott Paper Company. He was not employed in 1975. During the late 1960's, Sandra obtained employment with Monroe Medical Associates (hereinafter MMA), located in Monroe, Washington. MMA frequently received compensation from insurance companies and from state and local agencies for the medical services provided by its member-physicians. During the years 1973 through 1975, Sandra worked primarily as a receptionist for MMA. In this capacity, her duties included answering *20 telephones, scheduling appointments, opening the mail, handling incoming checks and signing the physicians' names to various insurance forms. With respect to incoming checks, Sandra was required to prepare written receipts for the office records, stamp the checks as received, and forward them to the person handling patient accounts. During the years 1973 through 1975, Sandra misappropriated certain checks totaling approximately $ 45,000 made payable to MMA. With respect to most of the misappropriated checks, Sandra forged the necessary payees' signatures, [2] endorsed the checks with either her own name or that of a fictitious person, one Sharon Jansen, and cashed them at the Monroe Branch of the Seattle First National Bank. Sandra cashed the checks at that bank because neither she nor petitioner had an account there. From her experience in signing hundreds of insurance forms each week for MMA, Sandra was able to accurately forge the respective physicians' signatures on the checks. To conceal her actions from MMA, Sandra did not write office receipts for the checks she *21 misappropriated. MMA's billing operation was informal and there was no automatic mechanism to indicate whether payment was received within a specified time. Prior to August 1975, Sandra was never questioned in any way by MMA concerning her handling of checks. Fearing that her actions might be discovered, Sandra involved petitioner in her scheme during 1973 and 1974. With respect to 18 misappropriated checks, primarily from the State of Washington, Sandra similarly forged the necessary payees' signatures, but then asked petitioner to cash them on his way to school. Sandra never disclosed to petitioner that she was misappropriating the checks from MMA. Sandra explained that she did not have time during her lunch break to cash those checks for the physicians at MMA. In each of those instances, Sandra enclosed a misappropriated check in a sealed envelope bearing the name MMA on the outside and instructed petitioner to cash the check and return the money to her. Sandra did not tell petitioner where to cash the checks or to follow any specific procedure. Petitioner knew that Sandra often handled cash and checks in her job and did not question her about these transactions. After *22 receiving each envelope, petitioner would drive his pick-up truck to the Everett Trust & Savings Bank, open the envelope, endorse the check with his own name, and then hand both the check and envelope to the drive-in teller. At that point, petitioner would always advise the teller to notify MMA if there was any problem. In each case, the teller handled the transaction in a separate room away from petitioner's view and returned the envelope to him with the cash enclosed therein. The teller never counted the money in front of petitioner and petitioner never opened any of the envelopes. Petitioner always placed the envelopes in the glove compartment of his truck and then drove directly to school. Petitioner returned the envelopes to Sandra on the same day that he cashed the misappropriated checks. On days when petitioner had only morning classes, Sandra would occasionally drive to their house during her lunch hour and hastily pick up the envelopes from him. She never opened the envelopes in petitioner's presence, but always placed them in her purse and told petitioner that she would return the money to the office. During the years 1973 through 1975, Sandra used the misappropriated *23 monies primarily for groceries, mortgage and utility payments, medical bills, clothing for her three children, furniture payments and miscellaneous household and living expenses. The following chart shows the total amount of income reported by petitioner and Sandra on their joint 1973 through 1975 Federal income tax returns and the total amount of expenditures made by them for those years: Income
Total
Year
Reported [3]
Expenditures
1973
$ 9,351.55
$ 20,737.33
1974
12,043.94
30,247.11
1975
4,426.94 17,154.64
Petitioner and Sandra did not make any extraordinary or lavish expenditures nor did they entertain or travel extensively. They lived in a house which Sandra had purchased in 1969 for $ 16,600 subject to a mortgage in excess of $ 14,000. Their standard of living remained substantially unchanged during the years at issue. In addition to his wages, petitioner received unemployment compensation and Veterans' Administration benefits in 1973 totaling $ 4,000. In 1974, he received approximately $ 2,000 from a self insured medical plan resulting from an accident at *24 work. In 1975, he received Veterans' Administration benefits of $ 4,380. During the years at issue, Sandra's former husband was obligated to pay monthly child support of $ 300. He paid only $ 600 during that three-year period. Petitioner was not aware that Sandra's former husband was not making his monthly support payments. During her marriage to petitioner, Sandra totally controlled the financial affairs of the family. Despite his college education, petitioner knew very little about financial matters and, therefore, trusted Sandra to handle all aspects thereof. Sandra paid all the bills, wrote most of the checks, [4] managed the joint checking account, made all bank deposits and withdrawals, and made most of the purchases for the family. Petitioner often accompanied Sandra on shopping trips, but she usually selected and paid for the items they purchased. Although petitioner cashed his own salary checks, he always gave the entire amount cashed to Sandra. Sandra deposited her salary directly into the joint checking account without showing petitioner the amounts she earned. Approximately twice a week, petitioner would ask Sandra for money to pay for commuting expenses and *25 other minor living expenses. Sandra usually gave petitioner the cash he requested but, on rare occasions, directed him to take the money from her purse. Petitioner never asked Sandra for more than forty dollars at any one time. On August 14 1975, responding to a summons, Sandra appeared at the Monroe Police Station and disclosed her misappropriations to the authorities. She subsequently appeared on August 27, 1975, and gave a more detailed account of her actions. Petitioner did not accompany Sandra to the police station but was aware of her appearances. Prior to March 1976, petitioner did not know either the specific reasons for Sandra's appearances or the contents of her various statements to the police. Petitioner trusted Sandra and did not believe she was involved in illegal activities. On March 22, 1976, an Amended Information was filed against Sandra and petitioner in the Superior Court of the State of Washington charging them with 18 counts of forgery arising from Sandra's embezzlement activities in 1973 and 1974. Prior to trial, Sandra pleaded *26 guilty to several counts of the Amended Information. On April 6, 1976, petitioner was acquitted by a jury on all 18 counts. Petitioner and Sandra separated in March 1976 and were divorced in January 1977. Pursuant to the divorce decree, petitioner received his personal apparel and effects and a 1969 Ford pick-up truck. He was also held responsible for marital debts of $ 2,020. Sandra received her personal apparel and effects, household furniture and furnishings, a 1973 Chevrolet, a bedroom set and the house. She was also responsible for marital debts of $ 15,640. [5]
Petitioner's and Sandra's joint Federal income tax returns for 1973, 1974, and 1975 were prepared by a family friend, R. Keith Jensen, from information supplied solely by Sandra. Petitioner had nothing to do with the preparation of those returns and was not present while they were being prepared. The amounts misappropriated by Sandra were not reported on the returns. Petitioner signed the returns for those years on January 27, 1974, February 8, 1975, and January 27, 1976, respectively, without looking at the figures *27 contained therein. At the time he signed the returns, petitioner had no knowledge that income had been omitted therefrom. In his separate statutory notices issued to petitioner and Sandra, respondent asserted deficiencies for 1973, 1974, and 1975 based upon the omissions from income of the funds misappropriated by Sandra. Respondent also determined that part of petitioner's and Sandra's underpayment of tax for those years was due to negligence or intentional disregard of rules and regulations under section 6653(a). Petitioner alone has petitioned this Court for a redetermination of these deficiencies and additions to tax. OPINION We must decide whether petitioner is relieved of tax liability as an innocent spouse under section 6013(e). As a general rule, when a husband and wife file a joint return each is jointly and severally liable for the tax. Sec. 6013(d)(3). Section 6013(e)[6] provides, however, that an "innocent spouse" may be relieved of tax liability resulting from omissions of income attributable to the other spouse if three conditions are met: (1) the omission was in excess of 25 percent of the amount of gross income stated in the return; (2) when signing *28 the return, the spouse claiming relief under this provision did not know of, and had no reason to know of the omission; and (3) taking into account all the facts and circumstances, including whether or not the "innocent spouse" significantly benefited from the omitted income, it would be inequitable to hold that spouse liable for the deficiencies in tax resulting from such omission. Fox v. Commissioner,61 T.C. 704, 716 (1974). Petitioner bears the burden of proving that each of these conditions has been satisfied. Adams v. Commissioner,60 T.C. 300, 303 (1973); Sonnenborn v. Commissioner,57 T.C. 373, 381 (1971). *29 Respondent concedes that the first condition has been met but contends that the second and third conditions have not been satisfied. Petitioner, of course, argues to the contrary. After considering the testimony and other evidence in this case, we conclude that petitioner has satisfied the requirements of section 6013(e) and, therefore is entitled to relief from tax liability as an innocent spouse. The record establishes to our satisfaction that petitioner lacked actual knowledge of the omitted income. Although petitioner endorsed and cashed 18 misappropriated checks for Sandra, we are convinced that he did not know those checks were stolen or that Sandra had forged the physicians' signatures. Sandra never disclosed her misappropriations to petitioner and, in fact, took various steps to conceal her illegal activities from him. As noted in our findings of fact, petitioner knew that Sandra handled checks for MMA and, therefore, his limited participation in her scheme would not necessarily have given him actual knowledge of the omitted income. Finally, both petitioner and Sandra testified that petitioner was not aware of the misappropriations when he signed the joint returns for *30 the years at issue. Accordingly, we find that petitioner had no actual knowledge within the meaning of section 6013(e)(1)(B). Next we consider whether petitioner had reason to know of the omitted income. The test to be applied is whether a reasonably prudent person under the circumstances of the taxpayer could be expected to know of the omitted income. Sanders v. United States,509 F. 2d 162, 166-167 (5th Cir. 1975); Terzian v. Commissioner,72 T.C. 1164, 1170 (1979). Respondent argues that since amounts expended by petitioner and Sandra substantially exceeded their reported income, petitioner should have been alerted to the omitted income. Respondent also points out that during the years at issue, petitioner actually cashed misappropriated checks for Sandra, occasionally obtained money from her purse which contained misappropriated funds and frequently discussed the family's financial affairs with her. In sum, respondent concludes that even if petitioner did not in fact know of the omitted income, there were sufficient facts within his knowledge which would have caused a reasonable person to have known of those omissions. On this record, we *31 must disagree. Although we recognize that there was a disparity between the family's total expenditures and their reported income for the years 1973 through 1975, this does not necessarily indicate that petitioner should have known of the omitted income. The record clearly shows that the misappropriated funds were used primarily for groceries, house payments, bills, furniture and other minor living expenses. These expenditures were in the nature of ordinary support and would not normally give a spouse reason to know of omitted income. Mysse v. Commissioner,57 T.C. 680, 698 (1972). Indeed, there is no evidence of any lavish or extraordinary expenditures which would have put petitioner on notice of unreported income. Cf. Estate of Jackson v. Commissioner,72 T.C. 356 (1979). While the record shows that petitioner frequently accompanied Sandra on shopping trips and was aware that she purchased various items for the family, the testimony adduced at trial reveals that he generally had no idea what such items cost. Furthermore, petitioner believed that Sandra's ex-husband was paying $ 300 monthly child support during the three years at issue and had *32 no reason to suspect that any expenditures for the children were made with omitted income.Finally, despite this disparity between expenditures and reported income, there was no sudden rise in the family's standard of living during those years which should have apprised him of the omissions. We also note that petitioner did not participate in the family's financial affairs nor was he involved in keeping books and records. Compare Quinn v. Commissioner,62 T.C. 223 (1974), affd. 524 F. 2d 617 (7th Cir. 1975), with Terzian v. Commissioner,supra. Sandra testified that petitioner was financially unsophisticated and trusted her to handle these matters. Among other things, Sandra paid the bills, managed the checking account, made most of the purchases, and controlled the family budget.Petitioner always gave his entire salary to Sandra, whereas she deposited her wages into the checking account without showing him the amounts she earned. While it is true that petitioner occasionally obtained cash from Sandra's purse, we believe his testimony that he never noticed any large sums of money contained therein. Moreover, contrary to respondent's *33 assertions, petitioner's testimony reveals that Sandra did not discuss financial matters and problems with him. Thus, when we consider Sandra's total dominance of the family's financial affairs and the fact that their standard of living remained substantially unchanged, we believe petitioner had no reason to suspect the existence of any unreported income. We reach the same conclusion with respect to petitioner's involvement in Sandra's scheme. Each of the misappropriated checks cashed by petitioner was made payable to MMA and, as previously noted, petitioner did not know that they were stolen and bore forged endorsements. Sandra repeatedly concealed her activities from him by explaining that time constraints prevented her from cashing the checks herself. As additional steps in this regard, Sandra always enclosed the misappropriated checks in sealed envelopes bearing the name MMA on the outside, never instructed petitioner where to cash those checks or how to do so, placed the returned envelopes in her purse, and then informed petitioner she would take the money back to the office. Furthermore, Sandra testified that petitioner had occasionally accompanied her while she deposited *34 cash and checks into MMA's bank account. In view of Sandra's actions and petitioner's knowledge concerning her job responsibilities, we do not believe that his handling of the checks should have put him on notice of the omitted income. Finally, the fact that petitioner was aware of Sandra's appearances at the Monroe Police Station in August 1975, fails to convince us he had reason to know of the omitted income in 1975. The record clearly establishes that, prior to March 1976, petitioner did not know either the specific reasons for Sandra's appearances or the contents of her statements. Furthermore, there is no evidence in the record that any action, legal or otherwise, was taken against Sandra as a result of her misappropriations before 1976. Accordingly, on the basis of the record before us, we conclude that petitioner had no reason to know of the omitted income when he signed the returns. The last question is whether, after taking into account all the facts and circumstances, including whether or not petitioner significantly benefited from the omitted income, it would be inequitable to hold him liable for the deficiencies attributable to such omissions. Respondent argues *35 that petitioner derived a significant benefit from the substantial expenditures made by Sandra during the years at issue and, therefore, should not be relieved of tax liability. We disagree. It is clear that where omitted income is used for the ordinary support of the innocent spouse, this does not constitute a significant benefit within the meaning of section 6013(e)(1)(C). Section 1.6013-5(b), Income Tax Regs.; Mysse v. Commissioner,supra at 698. Unusual support or transfers of property would, however, constitute such a benefit even if received by the spouse several years after the omitted income was properly includable in income. Section 1.6013-5(b), Income Tax Regs.
In the instant case, we have found that Sandra used the misappropriated monies primarily for groceries, bills and other items of ordinary support for the family. Thus, to that extent, petitioner did not significantly benefit from the omitted income.In addition, there were no unusual transfers of property to petitioner during either the years at issue or those subsequent thereto. No lavish gifts or other extraordinary expenditures for petitioner's benefit have been called to our attention. *36 The only assets which petitioner received in the divorce proceeding were his personal apparel and effects and a 1969 Ford pick-up truck. We do not consider such transfers as affording petitioner any significant benefit. Moreover, we note that as a result of the divorce, petitioner was held responsible for marital debts of $ 2,020. Under these circumstances, we think it would clearly be inequitable to hold petitioner liable for the deficiencies attributable to the unreported income. Accordingly, since petitioner has satisfied all the requirements of section 6013(e), we hold that he is entitled to the relief from liability provided thereunder. Decision will be entered for the petitioner. Footnotes
1. Statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. Sandra forged the signatures of the following physicians: Doctors Feek, Strub, Coop and McPhetres.↩
3. These amounts represent gross wages received by petitioner and Sandra.↩
4. During 1973 and 1974, petitioner wrote several checks to cover his college tuition and related education expenses.↩
5. At the time of the divorce decree, the outstanding mortgage on the house was $ 14,000.↩
6. SEC. 6013. JOINT RETURNS OF INCOME TAX BY HUSBAND AND WIFE. (e) Spouse Relieved of Liability in Certain Cases.-- (1) In General.--Under regulations prescribed by the Secretary or his delegate, if-- (A) A joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) Taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income. (2) Special rules.--For purposes of paragraph (1)-- (A) the determination of the spouse to whom items of gross income (other than gross income from property) are attributable shall be made without regard to community property laws, and (B) the amount omitted from gross income shall be determined in the manner provided by section 6501(e)(1)(A).↩