ESTATE OF OMAR L. ASH (DECEASED), STEPHEN V. ASH, ADMINISTRATOR C.T.A. AND SANDRA C. ASH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Ash v. Commissioner
Docket No. 9573-76
United States Tax Court
T.C. Memo 1981-575; 1981 Tax Ct. Memo LEXIS 177; 42 T.C.M. (CCH) 1310; T.C.M. (RIA) 81575; September 30, 1981. *177 1. On Jan. 7, 1969, Omar Ash and other directors of SCC improvidently granted an option to Reed to acquire 75,000 shares of SCC stock from SCC for less than 1 percent of its fair market value. Reed exercised the option the same day. Upon being advised by their accountants and attorneys that the option would be considered compensatory and excessive the directors entered into an agreement with Reed in October 1969 whereby Reed would reconvey half of his shares of stock to SCC for the amount he paid for them and the directors would transfer an equal number of shares to SCC from their personal holdings for the price Reed paid for the stock, thus making SCC whole. Ash's shares of stock were delivered to the SCC's stock transfer agent on December 24, 1969, and were cancelled on December 26, 1969, but the check in payment therefor was not issued to Ash until Jan. 8, 1970. Held: Any gain, loss or expense incurred by Ash as a result of transferring his stock to SCC must be recognized and accounted for in 1969, not 1970 as claimed by petitioners. 2. Ash owned all the stock of Sandomar, a corporation formed April 23, 1970, to engage in the business of buying and selling cattle. In the *178 latter part of December 1970 Ash went to Wichita, Kansas, to arrange for buying cattle and feed in Sandomar's name. A bank account was opened in Sandomar's name but not in Ash's name. The bank approved a loan to Sandomar on Dec. 30, 1970, for the purpose of buying cattle and feed. However, a check in the amount of this loan was issued to Ash and he and his wife signed the loan agreement. On Dec. 30, 1970, Ash endorsed the check to Sandomar and deposited it in Sandomar's bank account. Checks were immediately drawn on this account to make a prepayment for feed, a prepayment of interest to the bank, and to pay for 1,143 head of cattle. However, the bank treated the loan as a loan to Ash and the bill of sale for the cattle and feed was issued in Ash's name, until Ash formally transferred them to Sandomar on April 15, 1971. Held: Sandomar either bought the cattle and feed or Ash obtained the bank loan and used it to buy the feed and cattle for and in behalf of Sandomar. Petitioners may not deduct the prepayments for feed and interest on their return for 1970. 3. Held: Petitioners, Omar and Sandra Ash, filed a joint income tax return for 1970 and Sandra is jointly and serverally liable *179 for the deficiencies in tax for that year. Sandra is not relieved of liability under the innocent spouse provisions of section 6013(e), I.R.C. 1954. Section 6013(e) is not unconstitutional. John B. Huffaker and Reginald A. Krasney, for Stephen v. Ash. Norman Perlberger, for Sandra C. Ash. Stephen J. Sokolic, for respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1970 in the amount of $ 376,940. The issues presented for our decision are: (1) Whether a transfer of a corporation's own stock to it by Omar L. Ash gave rise to a long-term capital gain and a section 162, [1] business expense deduction; (2) Whether petitioners are entitled to deductions under section 162 and 163, respectively, of $ 476,093.85 for the prepayment of cattle feed and $ 20,245.43 for the prepayment of interest on a bank loan; and (3) Whether petitioner Sandra C. Ash is not liable for any deficiency in tax determined for 1970 because she is entitled to protection under the "innocent *180 spouse" provisions of section 6013(e), or because her signature on the joint return for 1970 was "involuntary." [2] *181 FINDINGS OF FACT Omar L. Ash (hereinafter Ash) and petitioner Sandra C. Ash (hereinafter Sandra) were husband-wife and they resided in Gladwyne, Pennsylvania, when they filed their petition herein. Ash and Sandra timely filed a joint Federal income tax return, using the cash basis method of accounting, for the taxable year 1970 with the Office of the Internal Revenue Service at Philadelphia, Pa.
Ash died on October 17, 1980. On April 13, 1981, petitioner Estate of Omar L. Ash (deceased), Stephen V. Ash, Administrator c.t.a., was substituted for Ash as a party in this proceeding. General Facts
Ash married Sandra in November 1970. (Sometimes hereinafter Ash and Sandra will be referred to collectively as petitioners.) The joint return for 1970 filed by petitioners was prepared solely by Ash. He presented it to Sandra for her signature on April 14, 1971, and she signed the return on that date without examining it or being told of the information contained therein. Petitioners *182 also timely filed a joint Federal income tax return for the taxable year 1971. Ash filed a single income tax return for the taxable year 1969. These returns were also filed using the cash basis method of accounting. Stock Transaction
Systems Capital Corporation (hereinafter SCC) was organized under the laws of the State of Delaware and was engaged in the business of leasing computers, aircraft and plant machinery. During the years 1968 and 1969, the principal shareholders of SCC were Ash, Donald Benscoter (hereinafter Benscoter), John Liecty (hereinafter liecty), Ronald Baldwin (hereinafter Baldwin) and Rex Staley (hereinafter Staley). During the years 1968, 1969, and up to December 10, 1970, Ash was the chairman of the board of directors of SCC and a member of the board's executive committee. Ash did not receive compensation directly from SCC for these activities. He did, however, receive a salary of $ 30,000 in 1969 and $ 48,205 in 1970 from Investment Leasing Services, Inc., a subsidiary corporation of SCC. The stock of SCC was traded on the over-the-counter market, the corporation having gone "public" in March 1968. At that time, SCC initiated a public offering of 150,000 *183 shares of its common stock, which offering was completed in April 1968. This public offering amounted to less than 10 percent of the total SCC stock outstanding during this period. Also in 1968 SCC made a public offering of debentures convertible into common stock, which debentures were converted into 83,000 shares of SCC common stock during 1968. These two offerings were the only public offerings of SCC stock during 1968, 1969 and 1970. On January 7, 1969, the board of directors of SCC unanimously approved the granting of an option by SCC to one Travis E. Reed, Jr. (hereinafter Reed), to acquire 75,000 shares of SCC stock at $ 0.067 per share, or $ 0.10 per share if the option were exercised in full at one time. Any shares acquired pursuant to the option were subject to certain restrictions on transferability. Ash, Benscoter, Baldwin and Staley were present at the board of directors meeting and voted to grant the stock option to Reed. Also present and voting in favor of granting the option was a Mr. McCowen. The only board member absent was Liecty. The minutes of the board of directors meeting provided in pertinent part: RESOLVED, That in consideration of the acceptance by *184 Travis E. Reed, Jr. of employment as Vice President of Systems Capital Corporation, and in consideration of his remaining in office as Executive Vice President of Systems Capital Aircraft, Inc., a subsidiary of this Corporation, and in further consideration of Mr. Reed's agreement not to engage in the leasing of commercial aircraft except on behalf of this Company, Systems Capital Corporation hereby grants to Travis E. Reed, Jr., an option to acquire 75,000 shares of the Corporation's Common Stock under the following terms and conditions: The stock option shall be exercisable from the date of grant for a period not to exceed five (5) years. The purchase price of the shares subject to this option shall be $ .067 per share, or if the option is exercised in full at one time, $ 7,500.00 BE IT FURTHER RESOLVED, That the extension of Option herein made Mr.Reed rescinds the action of the Board in granting a Stock Option to Mr. Reed, as of the meeting of the Board held on August 28, 1968. On January 7, 1969, Reed exercised the stock option in full for the entire 75,000 shares at a total cost of $ 7,500. On that date the average of the bid and asked prices for SCC stock on the over-the-counter *185 market was $ 47 per share. In February 1969 and SCC stock was split two-for-one, thereby increasing Reed's stock-holding to 150,000 shares. Following the February 1969 stock-split, Ash owned 900,000 shares of SCC stock, which amount represented approximately 25 percent of the outstanding SCC stock during that year. On February 26, 1969, representatives of SCC, including Ash, were informed by SCC's certified public accountants, Price Waterhouse & Co., that it was the latter's belief that the stock option granted to and exercised by Reed was compensatory in nature and, consequently, that, unless the option was substantially revised, the approximately $ 2.5 to $ 3 million difference between the market value of the stock received by Reed pursuant to the option and the option price paid by him would have to be charged to income over the period 1969-1973 (the length of Reed's employment agreement). In March 1969 SCC received a letter from its legal counsel concerning the stock option granted to Reed, in which letter was discussed both the potential charge to income and the potential for a stockholder derivative suit against the board of directors based on the claim that the grant of the *186 stock option was a waste of corporate assets. Legal counsel was of the opinion that, assuming the difference between market value of the stock and the option price was approximately $ 3 million, "The grant of compensatory options of this value would be held to be a waste of corporate assets." The letter further stated that the stock "transaction in the form set forth in the present [January 7, 1969] contract is not defensible and we believe that any stockholder bringing a derivative suit would be successful in obtaining" relief. Possible relief included recovery "from the Directors [of] such sums as the court found to be either excessive compensation or an excessive price paid to Mr. Reed…" [3] *187 or "revision of the entire transaction on the grounds that the transaction was fraudulent as to the Company and Mr. Reed was chargeable, as an officer of the Company, with knowledge that it was fraudulent." Subsequent to the receipt of this letter, SCC began to consider alternative courses of action, including recision of the stock-option transaction, to rectify any problems that arose because of the granting of the option to Reed. Negotiations commenced between SCC and Reed concerning the possibility of Reed retransferring the stock to SCC in exchange for the amount he had paid for it. By agreement dated May 21, 1969, Ash, Baldwin, Benscoter, Liecty and Staley, as shareholders and directors, agreed with SCC that: If it is ultimately determined, either in a suit or proceeding or by agreement between Reed and SCC, that Reed is entitled to retain any of the shares of SCC capital stock issued to him pursuant to the exercise of the said [January 7, 1969, stock] option, Shareholders agree to sell to SCC from their personal holdings of SCC capital stock, pro rata ccording to their holdings of SCC stock on March 29, 1968, at a price of $ 0.05 per share, [4] that number of shares which it is determined, as above stated, that Reed is entitled to retain, *188 provided, however, that in no event shall Shareholders be required under this Agreement to sell in the aggregate more than 20,000 shares of SCC capital stock to SCC. Also by agreement dated May 21, 1969, Ash and Benscoter, [5] as shareholders and directors, agreed with SCC that: 1. If and at such time as it is ultimately determined, either in a suit or proceeding or by agreement between Reed and SCC, that Reed may retain more than 20,000 shares of SCC capital stock issued to him pursuant to the exercise of the said [January 7, 1969, stock] options, Shareholders agree to sell to SCC from their personal holdings of SCC capital stock, at a price of $ .05 per share, that number of shares in excess of 20,000 which Reed retains according to the following proportions: Omar L. Ash
51.54%
Don L. Benscoter
48.46%
2. If either Shareholder is unable to promptly sell to SCC any shares required by paragraph 1 above, those additional shares shall be sold to SCC by the other Shareholder; provided, that such other Shareholder *189 shall have the right to purchase after a reasonable time those number of additional shares at $ .05 a share from the Shareholder unable to comply in the first instance. The foregoing two agreements were executed before any agreement was reached between SCC and Reed concerning the latter's retransfer of any stock to SCC. The purpose for executing the agreements as of May 21, 1969, was to enable Price Waterhouse & Co. to certify SCC's financial statement for 1968 without the inclusion of any adverse information concerning the stock option granted to Reed. [6] *190 McCowen, the only board member who did not sign either of the foregoing two agreements, did not individually reach any agreement with SCC concerning the transfer of personally owned shares to the company as a result of his involvement in the decision to grant the stock option to Reed. SCC's annual report for 1968, which was certified by Price Waterhouse & Co. as of May 23, 1969, contains the following footnote to the balance sheet: Note 11 - Events subsequent to balance sheet date On January 7, 1969, the Company issued 150,000 shares of capital stock, after giving effect to the two-for-one stock split described above, to Mr. Travis E. Reed, Jr., Vice President of the Company, for an aggregate consideration of $ 7,500 pursuant to an option granted that day. The mean between the bid and asked prices of the Company's stock at the close of business on January 7, 1969, after giving effect to the two-for-one stock split, was $ 23 per share. 130,000 of such shares are subject to certain restrictions and are repurchasable by the Company for the price paid by Mr. Reed upon the occurrence of certain conditions. The Company is of the opinion that this transaction should be rescinded entirely and is currently negotiating with Mr. Reed for the return of the 150,000 shares. It is not possible to determine at this time to what extent the Company will be able to rescing this transaction in whole or in part or *191 be able to repurchase the 130,000 shares of capital stock for the price paid by Mr. Reed. Certain directors and shareholders of the Company have agreed to transfer to the Company up to 150,000 shares from their holdings of the Company's capital stock at the price paid by Mr. Reed for the purpose of replacing shares not so acquired from Mr. Reed and putting the Company in the position in which it would have been if the transaction had been rescinded. In October 1969 and agreement was reached between SCC and Reed whereby, interalia, Reed agreed to return to SCC 75,000 shares (one-half of the number of shares held after the February 1969 stock split) in exchange for $ 3,750 (one-half of the total consideration paid of $ 7,500). Under this agreement Reed was to retain the remaining 75,000 shares. On November 11, 1969, the executive committee of SCC's board of directors approved the agreement reached with Reed, subject to the conditions that (1) Price Waterhouse and Co. confirm that, upon return of the 75,000 shares by Reed and the transfer by the shareholder-directors of 75,000 shares to SCC pursuant to the May 1969 agreements, no charge against income would be required in SCC's financial *192 statements; and (2) certain controlling shareholders, including Ash, agree to assume all of SCC's obligations under the agreement with Reed. On November 12, 1969, Price-Waterhouse advised that there would be no charge to income for 1969 from the Reed transaction provided counsel would render an opinion that the Reed transaction had been rescinded. By letter of November 17, 1969, legal counsel for SCC rendered an opinion that if all the provisions of the settlement agreement were carried out the Reed transaction "has been rescinded and the Company will be in the same position (financially) as if the transaction had never occurred." Counsel also wrote to the 5 stockholders on the same date advising that he had confirmed with Price-Waterhouse that the sale of the 75,000 shares to the company must be completed by December 31, 1969. The above-mentioned conditions were satisfied and the agreement between SCC and Reed was consummated. Under the terms of the May 1969 shareholder agreements, Ash was obligated to transfer 36,888 shares to SCC. To satisfy this obligation, and to satisfy shareholder-director Baldwin's obligation to transfer 2,140 shares which Baldwin was then unable to transfer, *193 Ash mailed stock certificates encompassing 39,035 shares (7 shares in excess of 36,288 - 2,140) to SCC's attorney on December 23, 1969, for forwarding to SCC's transfer agent. [7] These certificates were delivered to SCC's transfer agent on December 24, 1969, by legal counsel accompanied by a letter in which it was stated, "Please note that the shares must be transferred and cancelled by December 31, 1969, the end of the corporation's fiscal year." The 75,000 shares were cancelled by the transfer agent on December 26, 1969. On January 2, 1970, a new stock certificate for 7 shares was sent by SCC's transfer agent to SCC's attorney for forwarding to Ash. On January 8, 1970, SCC issued a check to Ash in the amount of $ 1,951.40, which amount equalled $ 0.05 per share for the 39,028 shares received from Ash and cancelled. Ash received this check on January 9, 1970. In its annual report for 1969, SCC reported net income of $ 1,070,609. Had SCC been required to charge against *194 its earnings a ratable portion of the difference between the fair market value of the stock (approximately $ 2.5-$ 3.0 million) acquired by Reed and the option price ($ 7,500), there would have been a substantial adverse impact on the market value of the SCC stock. Note 10 to this report, which was dated March 10, 1970, but was as of December 31, 1969, referred to the Travis Reed option and reported that the 150,000 shares issued to him had been returned to the company for $ 7,500, thereby placing the company in the position it would have been in had the transaction not occurred. For purposes of determining the amount of compensation to the deducted by SCC and reported by Reed with respect to the sale of 75,000 shares of SCC stock to Reed on January 7, 1969, SCC requested the brokerage house of Hayden Stone, Inc. to value those shares, which shares were subject to certain restrictions under the Securities Act of 1933. Because the stock option granted to Reed in January 1969 and the October 1969 agreement between Reed and SCC contained certain restrictions on Reed's ability to transfer the 75,000 shares which Reed ultimately retained under the October 1969 agreement, Hayden Stone *195 was requested to value the 75,000 shares in the follwoing manner: a 10,000-share block as of January 7, 1969; a 10,000-share block as of October 10, 1969; and a 55,000-share block as of January 2, 1970. Hayden Stone was of the opinion that the securities law restrictions on the stock and the "thin-market" for SCC stock required a 60 percent discount from the average of the bid and asked prices for the stock on January 7, 1969, and a 65 percent discount for October 10, 1969, and January 2, 1970. Accordingly, Hayden Stone valued the stock on a per-share basis as follows: [8] *196 Date
Average Market Price
Value
Jan. 7,1969
$ 47.00
$ 18.80
Oct. 10, 1969
5.50
1.93
Jan. 2,1970
5.50
1.93
According to Smith, Barney and Co., a Chicago brokerage firm, the bid and asked prices for SCC stock were $ 6.50 and $ 7.25 per share, respectively, on January 8, 1970, and $ 7.25 and $ 8.00 per share, respectively, on January 9, 1970. Respondent's stock-valuation expert witness, Fredrick Tebbon, was of the opinion that, on any particular day during the December 1969-January 1970 period, the per share value of the stock which Ash transferred to SCC equalled 50 percent of the mean of the bid and asked prices for the stock on that day. The 39,028 shares of stock which Ash transferred to SCC were not registered pursuant to the Securities Act of 1933. Further, at least 33,647 of those shares were subject to restrictions as contained in various shareholder agreements. Ash's basis in the 39,028 shares of stock transferred to SCC was $ 8,988, or $ *197 0.23 per share. On the joint return filed for 1970, Ash's reporting of the transfer had two components: (1) A miscellaneous business expense deduction in the amount of $ 202,946 was taken, which amount was calculated as the difference between a fair market value for the stock of $ 5.25 per share, and the $ 0.05 per share received from SCC; and (2) a long-term capital gain of $ 195,909 was included in income, which amount was calculated as the difference between a fair market value for the stock of $ 5.25 per share and Ash's $ 0.23 per-share basis therein. In the statutory notice of deficiency, respondent determined that neither the miscellaneous deduction nor the capital gain income were properly reported and, accordingly, he disallowed the deduction and excluded the capital gains from income in determining the deficiency. Cattle Feed Transactions
Sandomar Corporation (hereinafter Sandomar) is a Pennsylvania corporation having been incorporated on April 23, 1970. From that date through March 31, 1972, Ash owned 100 percent of the stock of Sandomar and he was the corporation's president and sole shareholder. Sandomar filed its first tax return utilizing an April 23, 1970-March 31, *198 1971 fiscal year. Its next return was filed on an April 1, 1971-March 31, 1972, fiscal year. A valid election to be taxed as a small business corporation under Subchapter S, I.R.C., was filed for Sandomar's taxable year beginning April 1, 1971. No earlier election was made for Sandomar's first taxable year. Sandomar's principal business activity during its first fiscal year ended March 31, 1971, was the purchase and sale of livestock. In December 1970 Sandomar purchased 7,000,000 pounds of feed for $ 155,400 and 1,954 head of cattle in Amarillo, Texas. [9]
Ash and his accountant-tax adviser travelled to Wichita, Kansas, on December 17, 1970, to gather information about cattle feeding operations with a view toward entering the cattle feeding business. Upon arriving in Kansas, Ash met and discussed with various individuals the prospects for the purchasing and feeding of cattle. Ash intended that any cattle and feed to be acquired would be *199 acquired by Sandomar. During the period involved Ash received information that grain prices were rising and that if a cattle feeding operation was undertaken, it would be beneficial to purchase feed at a fixed price. On December 17, 1970, Ash negotiated with and orally agreed to purchase 5,000 head of cattle from or through a Mr. Les Cooper, a cattle dealer associated with the livestock brokerage firm of Young & Cooper, Inc. On the same date Ash negotiated with a representative of Old Santa Fe Feeders, Inc. (hereinafter Old Santa Fe), a feedlot operator, for the purchase of feed for the cattle to be acquired. Ash orally agreed at that time to purchase feed from, and to feed his cattle on the feed lot of, Old Santa Fe. By letter dated December 18, 1970, Old Santa Fe informed Ash that, based on the understanding that 5,000 head of cattle would be acquired between December 21, 1970, and June 15, 1971, and they would be fed to finished grade (requiring an average feeding period of 160 days) prior to December 31, 1971, Old Santa Fe would sell to Ash the grain necessary, in the following quantities, to feed the cattle for the entire period: Tons
Ingredient
Cost Per Ton
Total Cost
94.4 Alfalfa Hay
$ 39.40
$ 27,359.36
1,075.2 Corn Silage
14.86
15,977.47
5,443.2 Corn
42.60
231,880.32
593.6 Molasses
38.97
23,132.59
1,814.4 Wheat
51.73
93,858.91
1,187.20
Sugar Beet Pulp
44.90
53,305.28
392.0 Premix
78.01
30,579.92
$ 476,093.85
*200 This price reflected both a quantity and cash discount. Old Santa Fe also agreed to give a cash discount of $ 0.02 per hundred weight of feed consumed. (See agreement between Old Santa Fe and Ash infra.) Old Santa Fe estimated that by buying in bulk in December Ash would pay approximately $ 28,000 less for grain than the normal feed costs would be during early spring and summer of 1971. In December 1970 Ash borrowed $ 210,000 from the Girard Trust Bank of Philadelphia, Pennsylvania. This money was ultimately used to purchase 1,143 head of cattle. On December 22, 1970, Ash wrote a letter to Cooper in which he set forth his understanding of the terms pursuant to which 5,000 head of cattle were to be acquired. Cooper acknowledged that the terms set forth also corresponded to his understanding. In pertinent part, the letter provided: I have completed tentative financial arrangements with the Fourth National Bank and Trust, Wichita, to acquire 5000 head of cattle and feed costing approximately $ 500,000 * * * * Please proceed at once with the acquisition of the 5000 head of cattle which are to be fed at the Old Santa Fe Feeders, Inc., feedlots in Sublette, Kansas. I understand that *201 you have 1,143 head of cattle on hand for immediate delivery. By document dated December 23, 1970, Ash, as sole director of Sandomar, consented to the adoption of the following resolution: RESOLVED, That the President of the Corporation is hereby authorized to purchase up to 7,500 head of beef cattle on or after December 23, 1970. FURTHER RESOLVED, That the President is hereby authorized to purchase feed for the feeding of said beef cattle on or after December 23, 1970. FURTHER RESOLVED, That the President is hereby authorized to borrow, on behalf of the Corporation, up to $ 2,000,000 at an interest rate of up to 8 1/2% from The Fourth National Bank and Trust Company of Wichita, Kansas in connection with the purchase of such cattle and feed with respect thereto. FURTHER RESOLVED, That the President is hereby authorized to borrow, on behalf of the Corporation, up to $ 600,000 at an interest rate of up to 9 1/2% from The First National Bank of Amarillo, Amarillo, Texas, in connection with the purchase of such cattle and feed with respect thereto. FURTHER RESOLVED, That the Presidentis [sic] hereby authorized to execute all documents which he deems necessary in order to purchase *202 such cattle and feed and finance the purchase thereof, his authority to be conclusively presumed by his execution of such documents. In correspondence between Ash and the Fourth National Bank and Trust Co., Wichita (hereinafter bank), dated December 21-24, 1969, concerning the financial arrangements for the purchase of the cattle and feed, it was understood that the loans were to be made to Sandomar, provided the Ashes would personally guarantee them and they were approved by the loan committee of the bank. To facilitate the granting of loans to Sandomar, Ash was prepared to contribute $ 700,000 to the corporation. Ash so advised his attorneys in Wichita. On December 29, 1970, a checking account was opened at the bank in the name of Sandomar Corporation. Ash did not open an individual account at the bank. Records of the bank contain the following with regard to loans for the purchase of cattle: Sandomar Corp. 12-28-70 (Loan Committee Meeting) $ 685,000 approved, rate 8 1/2%, secured by feed, cattle, and stock * * * * 12-30-70 (SPECIAL EXECUTIVE COMMITTEE MEETING) Approval was given to loan this corporation $ 685,000 to purchase $ 476,000 in feed and $ 210,000 worth of cattle, *203 for a period of six months, rate 8 1/2%, with interest paid in advance. Supported by 10% bank balances on a time open deposit account. Also, $ 300,000 worth of stock will be pledged which will be held in our collateral files. This corporation is a corporation of Omar Ash and his wife and will operate under Subchapter S. At some point in time, however, the bank decided not to make a loan to Sandomar because it did not have a certificate of authority to do business in Kansas and because it could not establish clear and identifiable ownership and title to the collateral to be pledged for the loan. Instead, the loan was to be made to Ash and Sandra. A cashiers check dated December 30, 1980, in the amount of $ 686,363.12 was drawn by the bank payable to Omar L. Ash and Sandra C. Ash. This check was endorsed by the Ashes, "Pay to the order of Sandomar Corporation," and was deposited in Sandomar's bank account on December 30, 1970. In addition, $ 50,000 had also been deposited in this account. [10] On December 30, 1970, Ash and Sandra *204 executed a security agreement note pursuant to which the bank made a loan of $ 476,363.12. As security for this loan, Ash and Sandra also executed a security agreement giving the bank a security interest in 1,143 head of cattle; 1,075.2 tons of corn silage; 1,500 tons of wheat; and 9,122.5 tons of ground corn. By checks drawn on Sandomar's account and dated December 29, 1970; (1) Young & Cooper, Inc. was paid $ 210,269.27 for 1,143 head of cattle; (2) Old Santa Fe was paid $ 476,093.85 for feed; and (3) the bank was paid $ 20,245.43 as interest on the $ 476,363.12 loan. The $ 20,245.43 amount represents interest at 8.5 percent on the principal amount of $ 476,363.12 for a period of 180 days (December 31, 1970, through June 28, 1971). After these checks were debited to the account, approximately $ 29,000 remained therein. On December 30, 1970, Cooper executed a bill of sale granting, selling and conveying to Ash 1,143 head of cattle then located at Old Santa Fe feed yards. On December 30, 1970, Ash and Old Santa Fe executed an agreement, the import of which was that Old Santa Fe agreed to undertake the care of the cattle purchased and to feed such cattle the grain obtained from *205 Old Santa Fe. No mention was made of Sandomar in the agreement. This agreement provided in relevant part: WITNESSETH: That, WHEREAS, Old Santa Fe is engaged in the business of custom feeding of cattle for customers and enjoys a reputation for providing a highly skilled program of feeding which is designed to obtain maximum advantageous weight growth at the minimum of cost therefor, and, WHEREAS, ASH is the owner of 1,143 head of mixed breed yearling steers and is in the processof [sic] acquiring additional cattle with the intention of owning approximately 5,000 head in the near future, and, WHEREAS, Ash owns 1075.2 Tons of corn silage, 1500 Tons of wheat and 9122.5 Tons of ground corn which he purchased to feed cattle owned by him, and which feed is presently located and stored at Old Santa Fe's Sublette, Kansas, feedlots and which is hereafter referred to as "Ash Feed", and, WHEREAS, Old Santa Fe is desirous of caring for and feeding Ash's cattle. NOW THEREFORE, it is agreed by and between the parties hereto that for and in consideration of the mutual promises, covenants and performances between them, the parties do respectively agreed as follows: FIRST: Old Santa Fe agrees to undertake *206 the care and feeding of the 1,143 head of mixed breed yearling steers owned by Ash and such additional Ash cattle (to a maximum of 5,000 head) which are delivered to its Sublette, Kansas, feedlots by June 15, 1971. SECOND: Old Santa Fe will determine the types of diets and rations and the procedures for the care of Ash's cattle, it being understood that such diets, rations and procedures will be calculated to provide the maximum growth of the cattle in the interests of sound economy. THIRD: In feeding Ash's cattle and preparing rations therefor, Ash authorizes and Old Santa Fe agrees to utilize and include Ash Feed, and Old Santa Fe agrees to store and maintain the same without charge for storage therefor. FOURTH: Ash agrees to pay Old Santa Fe for his cattle fed by Old Santa Fe at a yardage rate of five cents (5") per head per day and agrees to pay, in addition, Old Santa Fe's charges for ingredients other than Ash Feed which is fed Ash's cattle as follows: Alfalfa Hay
$ 39.40 Per Ton
Molasses
38.97 Per Ton
Sugar Beet Pulp
44.90 Per Ton
Premix
78.01 Per Ton
In addition, Ash agrees to Pay Old Santa Fe actual cost for veterinary services and medicines furnished Ash's cattle. Old Santa Fe *207 will invoice Ash bi-monthly for yardage, other ingredients, medicines and veterinary fees furnished, and Ash agrees to promptly pay such invoices as received. SEVENTH: On the completion of the feeding of Ash's cattle now located at Old Santa Fe's Sublette, Kansas, feedlots, or placed thereat by June 15, 1971, Old Santa Fe agrees to pay Ash a sum equal to two cents (2") per hundred weight (cwt) of all feed fed to such Ash cattle, including all corn silage, wheat, ground corn, alfalfa hay, molasses, sugar beet pulp and Premix. Such payment will be due and payable within fifteen (15) days following the completion of all such feeding. By letter dated January 15, 1971, from Sandomar Corporation to Old Santa Fe, it was agreed that too much corn sileage, corn and wheat had been purchased and that the excess feed would be traded (on a dollar-for-dollar basis) for the alfalfa hay, molasses, sugar beet pulp and premix to be fed to the cattle. In a handwritten letter dated December 31, 1970, from Ash to his attorney in Philadelphia, in a paragraph designated "Assignments," Ash stated: 1. Because of some technicalities in Kansas, the approx. $ 686,000 loan at 4th Nat'l Bank & Trust was made *208 by Mr. & Mrs. Omar L. Ash, and the cattle and feed were purchased in our names. However, we immediately assigned everything to Sandomar, subject to the loan, and let Sandomar assume the loan (the attorney has prepared these papers--the bank's records will not reflect such.) In Amarillo everything was clean - all purchases, loans, interest, accounts, etc. were in Sandomar's name. In order to close the Wichita deal, it was necessary for me (personally) to borrow $ 210,000 from Girard Trust Bank (unsecured). I immediately deposited the funds into the Sandomar account at 4th National Bank in Wichita. At the moment I am inclined to treat this as a capital contribution rather than a loan, & have the securities (which were put in Sandomar's name), treated as a loan. I hate to see Sandomar's statement appear "THIN", and, anyway, it has been necessary for me to personally guarantee Sandomar's obligations. On January 20, 1971, and April 5, 1971, petitioners signed Collateral Pledge Notes in the respective amounts of $ 800,000 and $ 210,000. By executing these notes, petitioners established lines of credit against which bank drafts were drawn for the purchase of additional head of cattle. *209 Drafts were drawn against these lines of credit for cattle and freight charges on the following dates: Date
Number of Head
Jan. 26
96
29
125
Feb. 2 138
3 236
5 110
Mar. 2 117
8 54
15
141
16
121
19
225
23
120
26
131
26
340
29
200
30
86
30
22
30
279
31
173
Apr. 12
308
3022
During the March-April 1971 period, Ash and Sandra also obtained other monies from the bank for the purchase of cattle.
On April 15, 1971, Ash, as sole director of Sandomar, consented to the adoption of a resolution which provided in pertinent part: RESOLVED, That the President of the corporation is hereby authorized to purchase a cattle inventory of 4,975 head, at price of $ 1,256,187, the purchase price to be paid by the corporation's assumption of the indebtedness against such cattle inventory owed to the Fourth National Bank and Trust Company, Wichita. FURTHER RESOLVED, That the President of the corporation is hereby authorized to enter into an agreement for and in behalf of the corporation reflecting the purchase of the cattle inventory and as a part thereof, assume the indebtedness against the same. FURTHER RESOLVED, That the President of the corporation is hereby authorized on behalf of the corporation to borrow up to $ 2,000,000 at an interest *210 rate of up to 8-1/2 per cent from The Fourth National Bank and Trust Company, Wichita, in connection with the assumption of the indebtedness owed against the cattle and any feed inventories and in connection with the purchase by the corporation of additional cattle and feed. On or about April 15, 1971, Ash transferred to Sandomar the cattle and feed previously purchased. On or about April 15, 1971, Sandomar borrowed $ 1,750,000 from the bank. On or about the same data, the Bank's liability ledger for Ash and Sandra reflected an outstanding balance on the various loans of $ 1,664,839.73. Sandomar used the $ 1,750,000 loan to pay off this outstanding balance, plus accrued interest of $ 10,242.43, resulting in a total payment of $ 1,675,082.16. The bank's records contain the following entries: SANDOMAR CORPORATION
4-2-71 (Loan Committee Meeting) Approval was given to transfer the borrowings of Omar Ash to the Sandomar Corp. Loans will continue to be secured by the existing collateral and in addition, the personal guarantee of Mr. & Mrs. Omar Ash. * * * 4-14-71 (Executive Committee Meeting) Approval was given to increase this company's approved line up to $ 1,750,000 secured by stock, *211 feed, and cattle. In April 1971, approximately $ 350,000 worth of feed remained. By September 1971 approximately $ 19,000 remained. On Ash's and Sandra's joint Federal income tax return for 1971, $ 1,256,187 of the payment made by Sandomar was allocated to cattle. From this amount a basis of $ 1,114,995 was subtracted and gain of $ 141,192 was reported. On petitioners' joint return for 1970, a $ 476,094 deduction for "feed purchased" was reported on the Schedule F (Farm Income and Expenses). No other items being reported on the schedule, this deduction gave rise to a net farm loss of equal amount, which in turn was included in the adjusted gross income computation. As a Schedule A itemized deduction on the same return, the $ 20,245 paid to the Fourth National Bank was deducted as an interest expense. Petitioners also reported the following on the return: Income
Wages
$ 50,311 Interest
3,568 Other: Business Loss
$ (176,073)
Sales or Exchanges
of Property
[11] *212 1,001,149 Pensions
857 Farm Loss
(476,094)
349,839 Adjusted Gross Income
403,718 Itemized Deductions [12]
(266,094)
(266,108)
Exemptions
( 2,500)
( 2,500)
Taxable Income
134,907 Ash reported adjusted gross income of $ 41,847 in 1969 and petitioners' reported $ 133,775 in 1971. In the statutory notice of deficiency, respondent disallowed both the $ 476,094 deduction for feed and the $ 20,245 deduction for interest. OPINION
Stock Transaction
The first issue for decision involves the tax treatment to be accorded Ash's transfer of 39,028 shares of SCC stock to SCC in connection with the "reversal" of the stock option granted to and exercised by Reed. This transfer was accounted for in the joint return filed by Ash and Sandra by: (1) The deduction of a miscellaneous business expense in the amount of $ 202,946, which amount represented the difference between the alleged $ 5.25 per-share fair market value of the stock and $ 0.05 per-share received by Ash from the SCC in consideration for the transfer, and (2) the inclusion in income of a long-term capital gain in the amount of $ 195,909, which amount *213 represented the difference between the alleged $ 5.25 per-share fair market value of the stock and Ash's $ 0.23 per-share basis therein. In the statutory notice of deficiency, respondent determined a deficiency by disallowing the deduction and not including the capital gain in income. Petitioners contend that the claimed deduction falls within the ambit of section 162 as a deduction for an ordinary and necessary expense paid during the taxable year in carrying on a trade or business. The gist of petitioners' contention is that the stock transfer was an expenditure paid during 1970 by Ash in carrying on his trade or business of being a corporate director of SCC. Petitioners argue that the transfer was made because its purpose was to reverse the effects on SCC of the exercise by Reed of the stock option and, thereby, remove any grounds for a possible shareholder-derivative suit against Ash as a corporate director for waste of corporate assets. Petitioners, of course, have the burden of proving their entitlement to the deduction. [13] *214 Rule 142(a), Tax Court Rules of Practice and Procedure; New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934). Respondent disputes each of the necessary elements of petitioners' section 162 argument, specifically: (1) That Ash was not in the trade or business of being a corporate director for purposes of section 162; (2) even if ash was in such trade or business, that the stock transfer was not made in the "carrying on" of this trade or business, *215 but rather was in the nature of a capital contribution by Ash as a shareholder (for which no deduction is allowable) for the purpose of protecting his investment in SCC; and (3) in any event, even if a deduction is otherwise allowable under section 162, the proper tax year for such deduction is 1969, when the stock was transferred to SCC, rather than 1970, the year at issue. Finally, respondent also disputes the amount of the deduction claimed by petitioners, contending that the fair market value of the transferred stock was considerably less than the value used in calculating the deduction claimed. We agree with respondent that this was a 1969 transaction for tax purposes, although not necessarily with his reasoning, and because only the year 1970 is before us we do not have to decide the other issues raised by the parties relative to the stock transaction. There can be no question from the evidence that all parties concerned intended the recision of the Reed option to be completed before the end of 1969. Since the option was granted and exercised in January of 1969, recision by the end of 1969 was the only way from an accounting standpoint that reflection of the transaction in *216 the financial statements for the year 1969 could be avoided. In fact, the stockholder-directors entered into the agreement with SCC to make it whole in May of 1969, long before the final settlement with Reed, to permit the accountants to defuse the option transaction in their audit report for 1968. The attorneys for SCC emphasized to all involved that all steps in the plan to rescind had to be carried out on or before December 31, 1969. The stockholder-directors were aware of this and they did everything they were required to do under the agreement before the end of 1969; Ash even agreed to sell additional shares of his own stock to make up for the shares that Baldwin was supposed to sell but could not produce at the time. The stock certificates were delivered to the stock transfer agent on December 24 and were cancelled on the corporate records on December 26, 1969. The financial records of the company as of December 31, 1969, were the same as though the option transaction had never taken place and in note 10 to the annual report for 1969 it was reported that the 150,000 shares issued to Reed had been returned to the company for $ 7,500, thereby placing the company in the position *217 it would have been in had the transaction not occurred. This necessarily meant that the entire $ 7,500 the company paid for the return of the stock, including the $ 1,951.40 paid to Ash, had been accounted for by December 31, 1969. Petitioners claim that because the certificate representing the 7 excess shares delivered by Ash was not issued to Ash until January 2, 1970, and because the check in the amount of $ 1,951.40 issued to Ash in Payment for his shares was not received by Ash until January 9, 1970, the capital transaction was not completed until 1970 and since the capital transaction was an integral part of the loss or expense incurred by Ash, both the capital gain and the expense must be recognized for tax purposes in 1970. Respondent agrees that the capital gain transaction (assuming that a gain was in fact realized) would be properly reportable in 1970, the year in which the payment for the stock was actually received, relying on Rev. Rul. 72-381, 1972-2 C.B. 233. But he claims that the capital gain and the loss are divisible transactions and that since all events had occurred in 1969 to fix the amount of the loss, it must be taken in that year. Initially, we confess *218 difficulty in understanding how there were two parts to the transaction or how Ash suffered a recognizable loss therefrom in anywhere near the amount claimed. The only actual transaction that took place was that Ash sold 39,028 shares of his stock to SCC for $ 1,951.40. Since his basis in those shares was $ 8,988, he suffered a loss of $ 7,036.60. The parties seem to expand this transaction into a multi-faceted transaction based on the theory, we assume, that if property that has appreciated in value is used to pay off an obligation gain is realized and recognized in the amount of the difference between the basis in the property and this amount of the obligation; if the amount of the obligation is not fixed, it is determined by the fair market value of the property transferred in satisfaction thereof. See United States v. Davis, 370 U.S. 65 (1962). Thus the obligor acquires a basis for claiming a loss, or expense, in the amount of the difference between the fair market value of the property transferred and the amount received therefor, if any. The recipient, we assume, would have to account for the same difference. United States v. Davis, supra.But here no deductible expense *219 had been incurred by Ash, the satisfaction of which would entitle him to a loss deduction. All Ash did was transfer stock, which had an untaxed appreciation in value, to the issuer for a nominal consideration. He had no fixed obligation to SCC which was satisfied; or if he had an obligation to make SCC whole, that obligation was worth only 5" a share to SCC. SCC had no gain on the transaction and Ash suffered a loss measured by the difference in his basis in the stock and the amount he received therefor. The way petitioner reported it gave Ash a fictitious long-term capital gain and a fictitious loss based on the appreciation in value of the stock which had never been taxed to him. But even if the transaction gave rise to a loss for Ash, as was reported by petitioners, we think it was attributable to 1969. If the loss was separable from the asserted capital gain transaction, which we don't believe it was, such loss was sustained in 1969 because the transaction was closed and completed in 1969 when his obligation to SCC was satisfied by transfer of stock. See Income Tax Regs. 1.165-1(b). Or if the timing of the loss must be tied to the timing of the capital transaction, we believe *220 the capital transaction was closed in 1969. It is true that Ash was a cash basis taxpayer and gain is not recognized to such a taxpayer until the year in which he actually or constructively receives it. Income Tax Regs. 1.451-1(a). A taxpayer is considered to be in constructive receipt of such gain for the taxable year during which "it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given." Income Tax Regs. 1.451-2(a). (Emphasis added). In the corporate context "made available" has been interpreted to mean that the seller has both the right and the power to receive payment in the preceding year. Hyland v. Commissioner, 175 F.2d 422 (2d Cir. 1949); affg. a Memorandum Opinion of this Court. Here Ash had transferred the stock to the company and it had been cancelled before the end of 1969. There was no provision in the agreement that payment for the stock would be deferred until 1970; in fact it was understood by everyone concerned that the entire transaction would be completed by December 31, 1969. Thus *221 Ash had the right to receive payment in 1969. He also had the power to obtain it.He was president, a director, and the largest stockholder of SCC. He could have demanded and received payment for the stock on or before December 31, 1969. There would have been no justification for withholding it. In fact, we imagine that the failure to issue the check until January 8, 1970, was due to oversight in light of the fact that the financial records of the company reflected complete rescission of the Reed option transaction by December 31, 1969. There was adequate time to issue the check after the stock was transferred and before December 31, 1969. This is a different situation than that described in Rev. Rul. 1972-381, supra, where stock was sold on the stock market on the last day of the year and payment was not received until the next year. Constructive receipt was not applicable there but it is here.The fact that the certificate for 7 excess shares was not issued until 1970 is irrelevant, Young, Exr. v. Commissioner, 6 B.T.A. 472 (1927). We conclude that any gain realized on the sale of the stock and any loss suffered by Ash in this transaction was realized and should be recognized *222 in 1969. [14] *223 *224 *225 See Cooney v. Commissioner, 18 T.C. 883 (1952); Huntington National Bank v. Commissioner, 90 F.2d 876 (6th Cir. 1937). Cattle Feed Transactions
The issues for decision center around the purchase in late December 1970 of cattle and the deductibility of: (1) A payment of $ 476,363.12 for feed for those cattle and others to be acquired; and (2) a payment of $ 20,245.43 as interest on a loan obtained in order to purchase the feed. Payments for both the feed and interest were also made in late December 1970. On their joint Federal return for 1970, petitioners deducted both the $ 476,363.12 and the $ 20,245.43 amounts. In the statutory notice of deficiency, respondent disallowed both deductions.
In litigating the question of the deductibility of the payments for feed and interest, the first question on which *226 the parties have focused is whether the payments for feed and interest were made by Ash for his own account or by him as agent or nominee for the benefit of Sandomar. [15]
Respondent contends that Ash intended to acquire the cattle and feed in the name of Sandomar when he travelled to Wichita; that he acted at al times on behalf of Sandomar; and that Sandomar, not Ash, purchased the feed and paid the interest and was the real debtor with respect to the loan at the bank. Accordingly, respondent argues, Sandomar, not Ash, is entitled to whatever deductions may be allowable. In circumstances such as this involving an individual and his solely-owned corporation with which the individual apparently was not always careful in preserving the distinction between his business activities and those of the corporation, it is difficult to pinpoint where his activities end and those of the corporation begin. Moreover, recitation of the general proposition that the substance of a transaction rather than its form controls *227 for tax purposes is of no particular benefit in this case because the "substance" of the cattle-feeding transaction would not be much changed regardless of whether Ash or Sandomar entered into it. The bank, Young and Cooper, and Old Santa Fe were entering into the various components of the overall transaction based on the underlying financial worthiness of Ash. We agree with respondent that Sandomar was a viable corporation and that Ash travelled to Wichita and conducted preliminary negotiations with the intention of structuring any cattle and feed purchases engaged in in the name of Sandomar. To effect this intention, Ash indicated a willingness to contribute sufficient capital to Sandomar. However, at the 11th-hour the bank would not loan the money to Sandomar because the corporation did not have a certificate of authority to do business in Kansas and because it could not establish clear and identifiable ownership and title for the collateral to be pledged for the loan. [16] Accordingly, Ash and Sandra individually signed the note for the loan and Ash individually was listed on the bill of sale for the cattle and entered the agreement with Old Santa Fe for the care and feeding *228 of the cattle. Nevertheless, according to Ash's letter of December 31, 1970, to his attorney, he immediately deposited the money in Sandomar's bank account and assigned everything to Sandomar, subject to the loan. Sandomar's bank account records bear this out because a cashiers check from the bank made payable to the Ashes was endorsed to Sandomar and deposited into its account. Checks were then drawn on Sandomar's bank account to pay for the feed and the interest that are in question. By letter dated January 15, 1971, a letter was written to Old Santa Fe in behalf of Sandomar in which reference was made to the feed and cattle "owned by this corporation." However, subsequent to 1970 both the bank and Old Santa Fe dealt with Ash as the owner of the feed and cattle and as the obligor on the loans until April 15, 1971, when a formal transfer of the cattle and the loans was made by the Ashes to Sandomar. The evidence is quite clear that Ash intended that the cattle business be conducted by Sandomar. The Amarillo cattle and feed transaction was carried *229 out in the name of Sandomar; and it is not questioned that after April 15, 1971, the Wichita cattle business was conducted by Sandomar. The question is whether the bank's last minute change in attitude which caused the Ashes to substitute temporarily for Sandomar made the Ashes the actual owners of the business for 3 1/2 months and entitles them to deductions for 1970 for prepaid feed and interest. We think not. [17] Unfortunately, there is very little evidence that the bank actually insisted that the transaction be structured in Ash's name rather than Sandomar, and if so, why. The loan to Sandomar was approved by the *230 loan committee and the executive committee of the bank on December 28 and December 30, 1970, respectively. No evidence in the form of minutes was offered to prove that the committees changed their minds or that they approved a loan to Ash personally. The Ashes would have been required to secure a loan to Sandomar anyway so there seems to be little reason for changing the transaction at the last minute. The only explanation we have of why this was done is the rather vague testimony of Mr. Lesher, who was handling the matter for the bank but who later became an officer of Sandomar, that Sandomar was not qualified to do business in Kansas and could not produce clear title to the securities that were to be used as collateral for the loan. We have no explanation of why Sandomar could not have been qualified to do business in Kansas and why there was an impediment in the title to the securities which Ash later told his attorney he had transferred to Sandomar. Furthermore, the use of Sandomar's bank account, for "convenience," does not ring true. In our opinion even if the bank insisted at the last minute that the loan be made in Ash's name, Ash intended it to be a Sandomar transaction *231 and took steps to carry out that purpose until he subsequently discovered that it was in his interest for tax purposes that the business be in his name for a while at least. [18] There is also evidence that the books and records of Sandomar were altered by erasing entries made at the end of the year which reflected that Sandomar received $ 686,363.12 as a loan from Ash and used *232 these funds to pay for the cattle and the feed and to pay interest. We recognize that the erasures could have been made to correct a mistake but that is not the usual way to correct a bookkeeping mistake. The facts that the bank treated the loans as being those of Ash until Sandomar formally took them over in April of 1971 and that the management of Old Santa Fe dealt with the cattle and feed as being the property of Ash until April of 1971 certainly support petitioners' version of the status of the business. Of course, the banker and the managers of the feed lot had dealt with Ash personally and basically were looking to Ash's assets as security for the transactions. There would be no reason for them to change unless instructed to do so by Ash. We think Ash must have realized soon after the beginning of 1971 that it was in his best interests to have the business in his own name for a while and consequently made no effort to straighten matters out until after Sandomar elected Subchapter S status. Based on all the evidence, we are convinced that Sandomar either bought the cattle and feed in its own right and assumed the obligations to the bank before the end of 1970 or that Ash *233 bought the cattle and feed and made the loans for and in behalf of Sandomar as its agent. Sandomar was a viable corporation formed by Ash to carry on legitimate business activities, and did carry on such activities, and its corporate existence cannot be ignored. Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943). Moreover, where a stockholder incurs an expense on behalf of a corporation, the expenditure is not deductible by him personally but is treated as a loan or a contribution of capital to the corporation. Deputy v. Dupont, 308 U.S. 488 (1940). Consequently, we conclude that petitioners are not entitled to a deduction for the feed purchased in December of 1970 or the interest paid to the bank in December of 1970. [19] *234 Liability of Petitioner Sandra Ash
The final issue for decision concerns the liability of Sandra Ash for any deficiency in petitioners' income tax determined herein. Petitioners filed a joint return for 1970 and their liability with respect to the tax therein is joint and several.Section 6013(d)(3). Sandra, however, makes two arguments in support of a contention that she should not be liable for any deficiency in tax for 1970. Sandra's first argument pertains to section 6013 and is framed as follows: Whether IRC § 6013 is unconstitutional on due process and equal protection grounds in that it arbitrarily provides relief for certain spouses but not to others who have been equally wronged.
Section 6013(e)(1) provides: (e) Spouse Relieved of Liability in Certain Cases.-- (1) In General. Under *235 regulations prescribed by the Secretary, if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income.
On brief Sandra discusses the legislative history of section 6013(e) and the reasons which led Congress to adopt the provision. She admits that she fails to qualify under section 6013(e) *236 because the deficiency herein arises from unallowable deductions, not a 25-percent omission of gross income.Section 6013(e)(1)(A). She states, however: A perusal of this record should make evident that, as applied, § 6013 is unconstitutional as there is no rational basis in precluding a spouse from establishing her innocent status in the case of fraudulent or improper deductions as with the relief provisions of § 6013(e) as to omitted gross income. Although she never specifically states the relief sought in the event this Court finds section 6013(e) unconstitutional "as applied," we can only conclude from the foregoing quotation that Sandra is seeking to have the Court apply section 6013(e) without reference to subparagraph (A). This conclusion comports with Sandra's statements on brief that she had no knowledge of (see subparagraph (B)) and received no benefit from (see subparagraph (C)) the unallowable deductions and, accordingly, that holding her liable would be inequitable. Although we recognize the financial straits in which she finds hereself, Sandra's constitutional argument is both without merit and self-defeating. The validity of the "25-percent-omission" requirement of *237 subparagraph (A) has been upheld. See Quinn v. Commissioner, 524 F.2d 617 (7th Cir. 1975), affg. 62 T.C. 223 (1974); Estate of Klein v. Commissioner, 63 T.C. 585 (1975), affd. 537 F.2d 701 (2d Cir. 1976), cert. denied 429 U.S. 980 (1976); Resnick v. Commissioner, 63 T.C. 524 (1975). While the exact arguments advanced herein by Sandra may not have been advanced in these cases, we do not read the cases as narrowly as she does. Moreover, even if we were to conclude that section 6013(e)(1)(A) is unconstitutional, such a conclusion would not enable us to apply section 6013(e)(1) without regard to subparagraph (A) or to otherwise rewrite the statute. Rather, the entire provision would be invalidated and Sandra would be liable for the deficiency in tax as a result of the joint and several liability undr section 6013(d)(3). Quinn v. Commissioner, supra at 626. As we understand it, Sandra also argues that since there is no rational basis in precluding a spouse from establishing her innocent status in the case of fraudulent or improper deductions as do the relief provisions of section 6013(e) with respect to omitted gross income, the entire section 6013 is unconstitutional, because the *238 arbitrariness of the relief remedies is a fundamental denial of due process. Sandra cites no case in support of this argument and we have found none. We do find that a legislative classification will not be set aside if any state of facts rationally justifying it is demonstrated or perceived by the courts. United States v. Maryland Savings-Share Insurance Corp., 400 U.S. 4, 6 (1975). The legislative history of the innocent spouse provisions indicate that Congress was concerned with situations involving illegal income such as embezzled funds and thus directed its attention toward the omission of gross income. We find that Congress had a rational basis for differentiating between cases involving omissions of income and those involving improper deductions. Section 6013(e) is a mitigation provision and not every taxpayer is entitled to relief. Estate of Klein v. Commissioner, 63 T.C. 585 (1975), affd. 537 F.2d 701 (2d Cir. 1976), cert. den. 429 U.S. 980; Resnick v. Commissioner, 63 T.C. 524 (1975). In Quinn v. Commissioner, 62 T.C. 223 (1974), affd. 524 F.2d 617 (7th Cir. 1975), this Court considered a due process and equal protection challenge to section 6013(e) and concluded *239 that the statute did not invidiously discriminate. It found that the relief provision was not unconstitutional where it related to a privilege whose election was voluntarily made. 62 T.C. at p. 231. Furthermore, we do not believe that even if the relief provisions of section 6013(e) were found to be unconstitutional this would pull the mantle of unconstitutionality over the voluntary and elective provisions of section 6013(a), which permits the filing of joint returns. In addition to the foregoing, Sandra has also failed to prove that she otherwise qualifies as an innocent spouse undr subparagraphs (B) and (C) of section 6013(e)(1).
Sandra has the burden of proving that she is entitled to the protection of section 6013(e). Sonnenborn v. Commissioner, 57 T.C. 373 (1971). Section 6013(e)(1)(B) requires an "innocent spouse" to establish "that in signing the return he or she did not know of, and had no reason to know of" the omission from income. In the context of this case, that would require that Sandra have no knowledge or no reason to know of the deductions at issue herein. Since the amount of the deductions are clearly set forth on the returns which she signed, we fail to see *240 how it could be said that she had no reason to know of them. Her failure to examine the return does not absolve her. [20]
Moreover, the knowledge requirement of subparagraph (B) is not knowledge of the tax consequences of a particular transaction but knowledge of the transaction itself. McCoy v. Commissioner, 57 T.C. 732 (1972).Sandra was with Ash in Wichita when the cattle feed transaction was consummated and she signed the note for the loan to purchase the feed. She obviously knew of this transaction. That she may have been unfamiliar with the tax consequences thereof is of no consequence.
Sandra has also not established, as required by section 6013(e)(1)(C), that she did not significantly benefit as a result of the erroneously claimed deductions. The fact that the deductions may have "sheltered" Ash's income and not Sandra's rather minimal income during the year in issue does not show that Sandra did not "benefit" from whatever tax savings may have been attributable to the claimed deductions. Based on the scant evidence of record, it appears that Ash and Sandra lived rather well and we cannot say that Sandra did not benefit. In summary, *241 we conclude that Sandra has failed to prove that she satifies the requirements of section 6013(e)(1)(B) and (C) and, consequently, that regardless of her constitutional argument concerning section 6013(e)(1)(A), she does not merit relief from liability as an innocent spouse under section 6013(e). Sandra's second argument in support of her contention that she should not be liable for a deficiency in ax for 1970 is that the return filed by petitioners should not be considered a joint return. As was the case with Sandra's first argument, this argument is an equitable one pursuant to which she asks that the Court consider her signature on the joint return to be either "involuntary" or "of no legal consequence," resulting in the further conclusion of no "joint" return. Her reasons for the foregoing request include: Although not tricked or coerced into signing the return, she relied on the confidential relationship between her husband and herself without suspecting the existence of improper deductions; and, having little or no income for the year, she did not benefit from the filing of a joint return. Again, while Sandra may paint an equitable picture, there is no question that the return *242 filed was a joint one, and that petitioners' liability with regard thereto is joint and several. Section 6013(d)(3). Sandra admits that she was not coerced or tricked into signing the return. The fact that she was unaware of the potential tax liability or relied on her husband to file the return is of no import. Douglas v. Commissioner, 27 T.C. 306 (1956). The question is whether Sandra intended that the return be joint. Estate of Campbell v. Commissioner, 56 T.C. 1 (1971). The only evidence of record is that she did.Accordingly, we conclude that the return filed for 1970 was a joint return and that Sandra's liability with regard thereto is joint and several. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable year in issue.↩
2. In support of evidentiary objections made and not ruled on at trial, the parties on brief argued numerous objections to various documents and testimony. For the most part, these objections were made by petitioners on the grounds that the evidence in question was "irrelevant and immaterial." Rule 401, Federal Rules of Evidence, which rules are applicable in this Court under Rule 143(a), Tax Court Rules of Practice and Procedure, provides: "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. The evidence in question to which petitioner objected was "relevant" to respondent's theories concerning the issues presented. Although we may not have agreed with respondent's analysis, he has the right to introduce evidence which supports his analysis and such evidence is not irrelevant and immaterial. Accordingly, petitioners' objections are overruled. With few exceptions, no further reference will be made to evidence in question. This is not to say, however, that factual findings in connection with the objected to evidence were made in each instance requested. We have made those findings which we considered necessary.
3. The letter's statement concerning "excessive price" refers to the possibility that the January 1969 stock option granted to Reed could be viewed as having been given in exchange for the release of an earlier-granted stock option, which earlier option was worth so much less than the January 1969 option that the granting of the January 1969 option would be found to be an "excessive price" for obtaining the return of the earlier option.
4. The $ 0.05 per share price reflects the 2-for-1 stock split in February 1969 after Reed had purchased shares in January 1969 for $ .10 per share.↩
5. Benscoter was president of SCC.↩
6. At trial respondent introduced both documentary and testimonial evidence, subject to petitioners' objection, to show that both of the agreements dated May 21, 1969, were in fact signed at a later time. Since the purpose for the timing of the agreements is undisputed, it is of no particular import when the agreements were actually signed and we have made no factual findings as to when the documents were signed.
7. A mistake was made initially in calculating the number of shares Ash was to sell under the agreement. The certificate Ash mailed to the attorney on December 23, 1969, covered the additional shares he was selling.↩
8. Petitioners objected to the introduction of this evidence on the grounds it was irrelevant and immaterial in that the dates and stock-amounts involved were not useful in valuing the stock which Ash transferred to SCC. Although the stock valuations of January and October 1969 are of little value, the valuation as of January 1970 is both near in time and stock amount to the time and amount which petitioners claim are critical. Moreover, we believe the manner in which the stock was valued is useful for our purposes. Although the question of the stock's value is not essential to the resolution of this issue presented, since we have held against petitioners on a question which prevented consideration of the valuation question, we have nonetheless included facts concerning valuation of the stock because they aid in providing a general understanding of this case.
9. The cost of the feed purchased at Amarillo was not claimed as a deduction on petitioners' 1970 return and has no direct bearing on the issues in this case. Sandomar deducted $ 155,400 for feed on its return for fiscal year ended March 31, 1971.↩
10. It is not explained why the bank drew a cashiers check in the amount of $ 686,363.12 if $ 210,000 of this amount was borrowed from Girard Trust Bank.↩
11. Included within this amount were long-term capital gains of $ 2,007,055 from sales of stock. 12. The principal component of the itemized deductions was the $ 202,946 deducted in connection with Ash's stock transfer to SCC. The $ 20,245 deducted as prepaid interest was included in a total of $ 37,898 deducted as interest expenses.↩
13. Petitioners defend the method used to account for the stock transfer (i.e. a business deduction and long-term capital gain inclusion) as proper under United States v. Davis, 370 U.S. 65 (1962). In Davis the Supreme Court held that taxpayer-husband's transfer of appreciated assets to his wife pursuant to a property settlement agreement was a taxable event upon which taxpayer-husband realized and recognized gain. Respondent does not challenge the correctness of petitioners' reporting both a deduction and a capital gain if petitioners are in fact entitled to a deduction at all. See Estate of Nickel v. Commissioner, T.C. Memo. 1962-55; cf. United States v. General Shoe Corp., 282 F.2d 9 (6th Cir. 1960), cert. denied 365 U.S. 843 (1961); International Freighting Corp. v. Commissioner, 135 F.2d 310 (2d Cir. 1943), affg. 45 B.T.A. 716 (1941); Tilford v. Commissioner, 75 T.C. 134, 147↩ (1980).
14. As noted above, having concluded that any gain or loss realized by petitioner must be accounted for in 1969, we need not decide whether a recognizable loss was actually incurred in the transaction. However, the parties presented voluminous evidence on that issue, have argued it on brief and our Findings of Fact contain all that is relevant to the inquiry. It is possible that if a loss was allowable for 1969, this might affect Ash's tax liability for 1970. In light of the circumstances we will very briefly summarize our thoughts on the issue. Because of the issuance of the improvident option to Reed the directors were open to a real charge of wasting corporate assets. Also Reed's exercise of the option made it compensatory and it would be chargeable to income, with a very unfavorable affect on the market value of the company stock. Both to protect themselves from a possible stockholders suit and to protect their investment in SCC stock, and we doubt that either reason could be considered the primary reason, the directors took steps to nullify or rescind the option transaction. Under the plan agreed upon by the directors and the company Reed transferred 1/2 of his shares back to the company for the price he paid for it and the directors transferred an equal number of shares to the company for the same price Reed paid for it.The number of shares each director transferred was pro rata to the number of shares he owned compared to the shares owned by the other four. The plan was carried out. As a result, Ash transferred over 39,000 shares of stock to SCC and received 5" a share therefor. This was a sale and Ash realized a capital loss in the amount of the difference between his basis in the stock and the amount received. Ash had no fixed obligation in any specified amount to SCC and we see no reason that a fictitious gain should be charged to him, measured by the difference between his basis in the stock and the fair market value thereof. Nor do we find that Ash suffered a loss or incurred an expense on the transaction, business or otherwise. All he did was to make SCC whole and nullify the effect on it of the Reed option. That affect was to dilute its capital among a larger number of shares. By returning those shares to SCC Ash simply increased the pro rata share of each of the other stockholders in the capital of the company. In doing so he suffered no actual loss except the difference in his basis and the amount received for the stock, which we have accounted for. Ash had never realized or recognized for tax purposes the difference between the fair market value of the stock and the price he received for it and we see no reason why he should be allowed a loss deduction, ordinary or capital, on this paper loss. He in effect contributed that difference to SCC, which satisfied the only obligation he might have had to the company. We add that we have doubts that Ash's activities as an officer and director of SCC would be recognized as being a business under the criteria established by Whipple v. Commissionr, 373 U.S. 193 (1963). Ash was not paid a salary by SCC and any expense he incurred could not be said to be for protection of his salary. Also, it could be questioned whether any loss or expense he incurred relative to the Reed transaction was an ordinary and necessary expense of his business of being a director of SCC. While any liability he might have incurred arose out of his job as a director his expenses were for his personal benefit. See Ditmars v. Commissioner, 302 F.2d 481 (2d Cir. 1962), revg. and remanding in part a Memorandum Opinion of this Court. And, finally, if the stock transfers are considered to be contributions to the corporation rather than sales, we think they would be considered to be pro rata. See Tilford v. Commissioner, 75 T.C. 134↩ (1980), for a discussion of the significance of a pro rata as opposed to a non-pro rata surrender of stock to the issuing corporation.
15. Although the purchase of the cattle is intertwined with the payments for the feed and interest, no issue is pending concerning the tax treatment of any payment for the cattle.↩
16. Although never specifically identified, apparently the collateral in question was stock which Ash had agreed to provide as security.↩
17. An issue we will not have to decide in light of our conclusion above is whether, if Ash were found to be the owner of the business and the payor of the obligations, he would qualify as a "farmer" entitled to elect to deduct instead of capitalize the cost of the feed under section 471, I.R.C. 1954, and Regs. 1.471-1. We think that to characterize him as a "farmer" in 1970, which he might have been for one day at the most in 1970 and formally transferred the business to Sandomar 3 1/2 months later, would stretch too far the purpose of Congress in enacting sec. 471↩.
18. The bank apparently thought Sandomar was a Subchapter S corporation and perhaps Ash thought so too. When it was discovered that Sandomar was not qualified and thus its deductions could not be passed through to Ash, Ash may have decided to restructure the cattle business and make it his own until Sandomar could make an election to become a Subchapter S corporation at the beginning of its next taxable year, starting April 1, 1971. This, however, was not accomplished. The courts have repeatedly held that while a taxpayer is free to organize his affairs as he chooses, nevertheless, having done so, he must accept the tax consequences of his choice, whether contemplated or not. Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134 (1974); Blanco v. United States, 602 F.2d 324↩ (Ct. Cl. 1979).
19. Here again our conclusion on this issue makes it unnecessary for us to decide other related issues argued by the parties and concerning which evidence was produced. We mention them briefly for the benefit of the parties. We have already referred to the question of whether Ash could qualify as a farmer under section 471 in footnote 17. We think the evidence supports the conclusion that the payment for the feed in December of 1970 was a prepayment, made for sound business reasons, and was not simply a deposit. We also find no reason why the interest prepaid for the approximately 6-month term of the loan in December 1970 should not be deductible by the obligor thereof in 1970. If there were sound business reasons for these prepayments, covering such short periods of time, which we think there was, there would be no distortion of income.
20. James v. Commissioner, T.C. Memo. 1980-99↩.